# UNITED STATES *v.* O'BRIEN.

No. 232.   Argued January 24, 1968.—Decided May 27, 1968.*

---

*Together with No. 233, *O'Brien* v. *United States,* also on certiorari to the same court.

*Solicitor General Griswold* argued the cause for the United States. With him on the brief were *Assistant Attorney General Vinson, Francis X. Beytagh, Jr., Beatrice Rosenberg,* and *Jerome M. Feit.*

*Marvin M. Karpatkin* argued the cause for respondent in No. 232 and petitioner in No. 233. With him on the brief were *Howard S. Whiteside, Melvin L. Wulf,* and *Rhoda H. Karpatkin.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

On the morning of March 31, 1966, David Paul O'Brien and three companions burned their Selective Service registration certificates on the steps of the South Boston Courthouse. A sizable crowd, including several agents of the Federal Bureau of Investigation, witnessed the event.[1] Immediately after the burning, members of the crowd began attacking O'Brien and his companions. An FBI agent ushered O'Brien to safety inside the courthouse. After he was advised of his right to counsel and to silence, O'Brien stated to FBI agents that he had burned his registration certificate because of his beliefs, knowing that he was violating federal law. He produced the charred remains of the certificate, which, with his consent, were photographed.

For this act, O'Brien was indicted, tried, convicted, and sentenced in the United States District Court for the District of Massachusetts.[2] He did not contest the fact

---

[1] At the time of the burning, the agents knew only that O'Brien and his three companions had burned small white cards. They later discovered that the card O'Brien burned was his registration certificate, and the undisputed assumption is that the same is true of his companions.

[2] He was sentenced under the Youth Corrections Act, 18 U. S. C. § 5010 (b), to the custody of the Attorney General for a maximum period of six years for supervision and treatment.

that he had burned the certificate. He stated in argument to the jury that he burned the certificate publicly to influence others to adopt his antiwar beliefs, as he put it, "so that other people would reevaluate their positions with Selective Service, with the armed forces, and reevaluate their place in the culture of today, to hopefully consider my position."

The indictment upon which he was tried charged that he "willfully and knowingly did mutilate, destroy, and change by burning . . . [his] Registration Certificate (Selective Service System Form No. 2); in violation of Title 50, App., United States Code, Section 462 (b)." Section 462 (b) is part of the Universal Military Training and Service Act of 1948. Section 462 (b)(3), one of six numbered subdivisions of § 462 (b), was amended by Congress in 1965, 79 Stat. 586 (adding the words italicized below), so that at the time O'Brien burned his certificate an offense was commited by any person,

> "who forges, alters, *knowingly destroys, knowingly mutilates,* or in any manner changes any such certificate . . . ." (Italics supplied.)

In the District Court, O'Brien argued that the 1965 Amendment prohibiting the knowing destruction or mutilation of certificates was unconstitutional because it was enacted to abridge free speech, and because it served no legitimate legislative purpose.[3] The District Court rejected these arguments, holding that the statute on its face did not abridge First Amendment rights, that the court was not competent to inquire into the motives of Congress in enacting the 1965 Amendment, and that the

---

[3] The issue of the constitutionality of the 1965 Amendment was raised by counsel representing O'Brien in a pretrial motion to dismiss the indictment. At trial and upon sentencing, O'Brien chose to represent himself. He was represented by counsel on his appeal to the Court of Appeals.

Amendment was a reasonable exercise of the power of Congress to raise armies.

On appeal, the Court of Appeals for the First Circuit held the 1965 Amendment unconstitutional as a law abridging freedom of speech.[4] At the time the Amendment was enacted, a regulation of the Selective Service System required registrants to keep their registration certificates in their "personal possession at all times." 32 CFR § 1617.1 (1962).[5] Wilful violations of regulations promulgated pursuant to the Universal Military Training and Service Act were made criminal by statute. 50 U. S. C. App. § 462 (b)(6). The Court of Appeals, therefore, was of the opinion that conduct punishable under the 1965 Amendment was already punishable under the nonpossession regulation, and consequently that the Amendment served no valid purpose; further, that in light of the prior regulation, the Amendment must have been "directed at public as distinguished from private destruction." On this basis, the court concluded that the 1965 Amendment ran afoul of the First Amendment by singling out persons engaged in protests for special treatment. The court ruled, however, that O'Brien's conviction should be affirmed under the statutory provision, 50 U. S. C. App. § 462 (b)(6), which in its view made violation of the nonpossession regulation a crime, because it regarded such violation to be a lesser included offense of the crime defined by the 1965 Amendment.[6]

---

[4] *O'Brien* v. *United States,* 376 F. 2d 538 (C. A. 1st Cir. 1967).

[5] The portion of 32 CFR relevant to the instant case was revised as of January 1, 1967. Citations in this opinion are to the 1962 edition which was in effect when O'Brien committed the crime, and when Congress enacted the 1965 Amendment.

[6] The Court of Appeals nevertheless remanded the case to the District Court to vacate the sentence and resentence O'Brien. In

The Government petitioned for certiorari in No. 232, arguing that the Court of Appeals erred in holding the statute unconstitutional, and that its decision conflicted with decisions by the Courts of Appeals for the Second [7] and Eighth Circuits [8] upholding the 1965 Amendment against identical constitutional challenges.  O'Brien cross-petitioned for certiorari in No. 233, arguing that the Court of Appeals erred in sustaining his conviction on the basis of a crime of which he was neither charged nor tried.  We granted the Government's petition to resolve the conflict in the circuits, and we also granted O'Brien's cross-petition.  We hold that the 1965 Amendment is constitutional both as enacted and as applied.  We therefore vacate the judgment of the Court of Appeals and reinstate the judgment and sentence of the District Court without reaching the issue raised by O'Brien in No. 233.

## I.

When a male reaches the age of 18, he is required by the Universal Military Training and Service Act to register with a local draft board.[9]  He is assigned a Selective Service number,[10] and within five days he is issued a

---

the court's view, the district judge might have considered the violation of the 1965 Amendment as an aggravating circumstance in imposing sentence.  The Court of Appeals subsequently denied O'Brien's petition for a rehearing, in which he argued that he had not been charged, tried, or convicted for nonpossession, and that nonpossession was not a lesser included offense of mutilation or destruction. *O'Brien* v. *United States,* 376 F. 2d 538, 542 (C. A. 1st Cir. 1967).

[7] *United States* v. *Miller,* 367 F. 2d 72 (C. A. 2d Cir. 1966), cert. denied, 386 U. S. 911 (1967).

[8] *Smith* v. *United States,* 368 F. 2d 529 (C. A. 8th Cir. 1966).

[9] See 62 Stat. 605, as amended, 65 Stat. 76, 50 U. S. C. App. § 453; 32 CFR § 1613.1 (1962).

[10] 32 CFR § 1621.2 (1962).

registration certificate (SSS Form No. 2).[11] Subsequently, and based on a questionnaire completed by the registrant,[12] he is assigned a classification denoting his eligibility for induction,[13] and "[a]s soon as practicable" thereafter he is issued a Notice of Classification (SSS Form No. 110).[14] This initial classification is not necessarily permanent,[15] and if in the interim before induction the registrant's status changes in some relevant way, he may be reclassified.[16] After such a reclassification, the local board "as soon as practicable" issues to the registrant a new Notice of Classification.[17]

Both the registration and classification certificates are small white cards, approximately 2 by 3 inches. The registration certificate specifies the name of the registrant, the date of registration, and the number and address of the local board with which he is registered. Also inscribed upon it are the date and place of the registrant's birth, his residence at registration, his physical description, his signature, and his Selective Service number. The Selective Service number itself indicates his State of registration, his local board, his year of birth, and his chronological position in the local board's classification record.[18]

The classification certificate shows the registrant's name, Selective Service number, signature, and eligibility classification. It specifies whether he was so classified by his local board, an appeal board, or the President. It

---

[11] 32 CFR § 1613.43a (1962).

[12] 32 CFR §§ 1621.9, 1623.1 (1962).

[13] 32 CFR §§ 1623.1, 1623.2 (1962).

[14] 32 CFR § 1623.4 (1962).

[15] 32 CFR § 1625.1 (1962).

[16] 32 CFR §§ 1625.1, 1625.2, 1625.3, 1625.4, and 1625.11 (1962).

[17] 32 CFR § 1625.12 (1962).

[18] 32 CFR § 1621.2 (1962).

contains the address of his local board and the date the certificate was mailed.

Both the registration and classification certificates bear notices that the registrant must notify his local board in writing of every change in address, physical condition, and occupational, marital, family, dependency, and military status, and of any other fact which might change his classification. Both also contain a notice that the registrant's Selective Service number should appear on all communications to his local board.

Congress demonstrated its concern that certificates issued by the Selective Service System might be abused well before the 1965 Amendment here challenged. The 1948 Act, 62 Stat. 604, itself prohibited many different abuses involving "any registration certificate, . . . or any other certificate issued pursuant to or prescribed by the provisions of this title, or rules or regulations promulgated hereunder . . . ." 62 Stat. 622. Under §§ 12 (b)(1)–(5) of the 1948 Act, it was unlawful (1) to transfer a certificate to aid a person in making false identification; (2) to possess a certificate not duly issued with the intent of using it for false identification; (3) to forge, alter, "or in any manner" change a certificate or any notation validly inscribed thereon; (4) to photograph or make an imitation of a certificate for the purpose of false identification; and (5) to possess a counterfeited or altered certificate. 62 Stat. 622. In addition, as previously mentioned, regulations of the Selective Service System required registrants to keep both their registration and classification certificates in their personal possession at all times. 32 CFR § 1617.1 (1962) (Registration Certificates); [19] 32 CFR § 1623.5

---

[19] 32 CFR § 1617.1 (1962), provides, in relevant part:

"Every person required to present himself for and submit to registration must, after he is registered, have in his personal possession at all times his Registration Certificate (SSS Form No. 2)

(1962) (Classification Certificates).[20] And § 12 (b)(6) of the Act, 62 Stat. 622, made knowing violation of any provision of the Act or rules and regulations promulgated pursuant thereto a felony.

By the 1965 Amendment, Congress added to § 12 (b)(3) of the 1948 Act the provision here at issue, subjecting to criminal liability not only one who "forges, alters, or in any manner changes" but also one who "knowingly destroys, [or] knowingly mutilates" a certificate. We note at the outset that the 1965 Amendment plainly does not abridge free speech on its face, and we do not understand O'Brien to argue otherwise. Amended § 12 (b)(3) on its face deals with conduct having no connection with speech. It prohibits the knowing destruction of certificates issued by the Selective Service System, and there is nothing necessarily expressive about such conduct. The Amendment does not distinguish between public and private destruction, and it does not punish only destruction engaged in for the purpose of expressing views. Compare *Stromberg* v. *California*, 283 U. S. 359 (1931).[21] A law prohibiting destruction of Selective Service certificates no more abridges free speech on its face than a motor vehicle law prohibiting the destruction of drivers' licenses, or a tax law prohibiting the destruction of books and records.

---

prepared by his local board which has not been altered and on which no notation duly and validly inscribed thereon has been changed in any manner after its preparation by the local board. The failure of any person to have his Registration Certificate (SSS Form No. 2) in his personal possession shall be prima facie evidence of his failure to register."

[20] 32 CFR § 1623.5 (1962), provides, in relevant part:

"Every person who has been classified by a local board must have in his personal possession at all times, in addition to his Registration Certificate (SSS Form No. 2), a valid Notice of Classification (SSS Form No. 110) issued to him showing his current classification."

[21] See text, *infra*, at 382.

O'Brien nonetheless argues that the 1965 Amendment is unconstitutional in its application to him, and is unconstitutional as enacted because what he calls the "purpose" of Congress was "to suppress freedom of speech." We consider these arguments separately.

## II.

O'Brien first argues that the 1965 Amendment is unconstitutional as applied to him because his act of burning his registration certificate was protected "symbolic speech" within the First Amendment. His argument is that the freedom of expression which the First Amendment guarantees includes all modes of "communication of ideas by conduct," and that his conduct is within this definition because he did it in "demonstration against the war and against the draft."

We cannot accept the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea. However, even on the assumption that the alleged communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment, it does not necessarily follow that the destruction of a registration certificate is constitutionally protected activity. This Court has held that when "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling;[22] substantial;[23] subordi-

---

[22] *NAACP* v. *Button,* 371 U. S. 415, 438 (1963); see also *Sherbert* v. *Verner,* 374 U. S. 398, 403 (1963).

[23] *NAACP* v. *Button,* 371 U. S. 415, 444 (1963); *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 464 (1958).

nating;[24] paramount;[25] cogent;[26] strong.[27] Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. We find that the 1965 Amendment to § 12 (b)(3) of the Universal Military Training and Service Act meets all of these requirements, and consequently that O'Brien can be constitutionally convicted for violating it.

The constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping. *Lichter* v. *United States,* 334 U. S. 742, 755–758 (1948); *Selective Draft Law Cases,* 245 U. S. 366 (1918); see also *Ex parte Quirin,* 317 U. S. 1, 25–26 (1942). The power of Congress to classify and conscript manpower for military service is "beyond question." *Lichter* v. *United States, supra,* at 756; *Selective Draft Law Cases, supra.* Pursuant to this power, Congress may establish a system of registration for individuals liable for training and service, and may require such individuals within reason to cooperate in the registration system. The issuance of certificates indicating the registration and eligibility classification of individuals is a legitimate and substantial administrative aid in the functioning of this system. And legislation

---

[24] *Bates* v. *Little Rock,* 361 U. S. 516, 524 (1960).

[25] *Thomas* v. *Collins,* 323 U. S. 516, 530 (1945); see also *Sherbert* v. *Verner,* 374 U. S. 398, 406 (1963).

[26] *Bates* v. *Little Rock,* 361 U. S. 516, 524 (1960).

[27] *Sherbert* v. *Verner,* 374 U. S. 398, 408 (1963).

to insure the continuing availability of issued certificates serves a legitimate and substantial purpose in the system's administration.

O'Brien's argument to the contrary is necessarily premised upon his unrealistic characterization of Selective Service certificates. He essentially adopts the position that such certificates are so many pieces of paper designed to notify registrants of their registration or classification, to be retained or tossed in the wastebasket according to the convenience or taste of the registrant. Once the registrant has received notification, according to this view, there is no reason for him to retain the certificates. O'Brien notes that most of the information on a registration certificate serves no notification purpose at all; the registrant hardly needs to be told his address and physical characteristics. We agree that the registration certificate contains much information of which the registrant needs no notification. This circumstance, however, does not lead to the conclusion that the certificate serves no purpose, but that, like the classification certificate, it serves purposes in addition to initial notification. Many of these purposes would be defeated by the certificates' destruction or mutilation. Among these are:

1. The registration certificate serves as proof that the individual described thereon has registered for the draft. The classification certificate shows the eligibility classification of a named but undescribed individual. Voluntarily displaying the two certificates is an easy and painless way for a young man to dispel a question as to whether he might be delinquent in his Selective Service obligations. Correspondingly, the availability of the certificates for such display relieves the Selective Service System of the administrative burden it would otherwise have in verifying the registration and classification of all suspected delinquents. Further, since both certificates are in the nature of "receipts" attesting that the regis-

trant has done what the law requires, it is in the interest of the just and efficient administration of the system that they be continually available, in the event, for example, of a mix-up in the registrant's file.. Additionally, in a time of national crisis, reasonable availability to each registrant of the two small cards assures a rapid and uncomplicated means for determining his fitness for immediate induction, no matter how distant in our mobile society he may be from his local board.

2. The information supplied on the certificates facilitates communication between registrants and local boards, simplifying the system and benefiting all concerned. To begin with, each certificate bears the address of the registrant's local board, an item unlikely to be committed to memory. Further, each card bears the registrant's Selective Service number, and a registrant who has his number readily available so that he can communicate it to his local board when he supplies or requests information can make simpler the board's task in locating his file. Finally, a registrant's inquiry, particularly through a local board other than his own, concerning his eligibility status is frequently answerable simply on the basis of his classification certificate; whereas, if the certificate were not reasonably available and the registrant were uncertain of his classification, the task of answering his questions would be considerably complicated.

3. Both certificates carry continual reminders that the registrant must notify his local board of any change of address, and other specified changes in his status. The smooth functioning of the system requires that local boards be continually aware of the status and whereabouts of registrants, and the destruction of certificates deprives the system of a potentially useful notice device.

4. The regulatory scheme involving Selective Service certificates includes clearly valid prohibitions against the alteration, forgery, or similar deceptive misuse of certifi-

cates. The destruction or mutilation of certificates obviously increases the difficulty of detecting and tracing abuses such as these. Further, a mutilated certificate might itself be used for deceptive purposes.

The many functions performed by Selective Service certificates establish beyond doubt that Congress has a legitimate and substantial interest in preventing their wanton and unrestrained destruction and assuring their continuing availability by punishing people who knowingly and wilfully destroy or mutilate them. And we are unpersuaded that the pre-existence of the nonpossession regulations in any way negates this interest.

In the absence of a question as to multiple punishment, it has never been suggested that there is anything improper in Congress' providing alternative statutory avenues of prosecution to assure the effective protection of one and the same interest. Compare the majority and dissenting opinions in *Gore* v. *United States,* 357 U. S. 386 (1958).[28] Here, the pre-existing avenue of prosecution was not even statutory. Regulations may be modified or revoked from time to time by administrative discretion. Certainly, the Congress may change or supplement a regulation.

Equally important, a comparison of the regulations with the 1965 Amendment indicates that they protect overlapping but not identical governmental interests, and that they reach somewhat different classes of wrongdoers.[29] The gravamen of the offense defined by the statute is the deliberate rendering of certificates unavailable for the various purposes which they may serve. Whether registrants keep their certificates in their per-

---

[28] Cf. *Milanovich* v. *United States,* 365 U. S. 551 (1961); *Heflin* v. *United States,* 358 U. S. 415 (1959); *Prince* v. *United States,* 352 U. S. 322 (1957).

[29] Cf. *Milanovich* v. *United States,* 365 U. S. 551 (1961); *Heflin* v. *United States,* 358 U. S. 415 (1959); *Prince* v. *United States,* 352 U. S. 322 (1957).

sonal possession at all times, as required by the regulations, is of no particular concern under the 1965 Amendment, as long as they do not mutilate or destroy the certificates so as to render them unavailable.  Although as we note below we are not concerned here with the nonpossession regulations, it is not inappropriate to observe that the essential elements of nonpossession are not identical with those of mutilation or destruction. Finally, the 1965 Amendment, like § 12 (b) which it amended, is concerned with abuses involving *any* issued Selective Service certificates, not only with the registrant's own certificates.  The knowing destruction or mutilation of someone else's certificates would therefore violate the statute but not the nonpossession regulations.

We think it apparent that the continuing availability to each registrant of his Selective Service certificates substantially furthers the smooth and proper functioning of the system that Congress has established to raise armies. We think it also apparent that the Nation has a vital interest in having a system for raising armies that functions with maximum efficiency and is capable of easily and quickly responding to continually changing circumstances.  For these reasons, the Government has a substantial interest in assuring the continuing availability of issued Selective Service certificates.

It is equally clear that the 1965 Amendment specifically protects this substantial governmental interest. We perceive no alternative means that would more precisely and narrowly assure the continuing availability of issued Selective Service certificates than a law which prohibits their wilful mutilation or destruction.  Compare *Sherbert* v. *Verner,* 374 U. S. 398, 407–408 (1963), and the cases cited therein.  The 1965 Amendment prohibits such conduct and does nothing more.  In other words, both the governmental interest and the operation of the 1965 Amendment are limited to the noncommuni-

cative aspect of O'Brien's conduct. The governmental interest and the scope of the 1965 Amendment are limited to preventing harm to the smooth and efficient functioning of the Selective Service System. When O'Brien deliberately rendered unavailable his registration certificate, he wilfully frustrated this governmental interest. For this noncommunicative impact of his conduct, and for nothing else, he was convicted.

The case at bar is therefore unlike one where the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful. In *Stromberg* v. *California,* 283 U. S. 359 (1931), for example, this Court struck down a statutory phrase which punished people who expressed their "opposition to organized government" by displaying "any flag, badge, banner, or device." Since the statute there was aimed at suppressing communication it could not be sustained as a regulation of noncommunicative conduct. See also, *NLRB* v. *Fruit & Vegetable Packers Union,* 377 U. S. 58, 79 (1964) (concurring opinion).

In conclusion, we find that because of the Government's substantial interest in assuring the continuing availability of issued Selective Service certificates, because amended § 462 (b) is an appropriately narrow means of protecting this interest and condemns only the independent noncommunicative impact of conduct within its reach, and because the noncommunicative impact of O'Brien's act of burning his registration certificate frustrated the Government's interest, a sufficient governmental interest has been shown to justify O'Brien's conviction.

### III.

O'Brien finally argues that the 1965 Amendment is unconstitutional as enacted because what he calls the "purpose" of Congress was "to suppress freedom of

speech." We reject this argument because under settled principles the purpose of Congress, as O'Brien uses that term, is not a basis for declaring this legislation unconstitutional.

It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive. As the Court long ago stated:

> "The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted." *McCray* v. *United States,* 195 U. S. 27, 56 (1904).

This fundamental principle of constitutional adjudication was reaffirmed and the many cases were collected by Mr. Justice Brandeis for the Court in *Arizona* v. *California,* 283 U. S. 423, 455 (1931).

Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature,[30] because the benefit to sound decision-making in

---

[30] The Court may make the same assumption in a very limited and well-defined class of cases where the very nature of the constitutional question requires an inquiry into legislative purpose. The principal class of cases is readily apparent—those in which statutes have been challenged as bills of attainder. This Court's decisions have defined a bill of attainder as a legislative Act which inflicts punishment on named individuals or members of an easily ascertainable group without a judicial trial. In determining whether a particular statute is a bill of attainder, the analysis necessarily requires an inquiry into whether the three definitional elements—specificity in identification, punishment, and lack of a judicial trial—are contained in the statute. The inquiry into whether the challenged statute contains the necessary element of punishment has on occasion led the Court to examine the legislative motive in

this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a "wiser" speech about it.

O'Brien's position, and to some extent that of the court below, rest upon a misunderstanding of *Grosjean* v. *American Press Co.*, 297 U. S. 233 (1936), and *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960). These cases stand, not for the proposition that legislative motive is a proper basis for declaring a statute unconstitutional, but that the inevitable effect of a statute on its face may render it unconstitutional. Thus, in *Grosjean* the Court, having concluded that the right of publications to be free from certain kinds of taxes was a freedom of the press protected by the First Amendment, struck down a statute which on its face did nothing other than impose

---

enacting the statute. See, *e. g., United States* v. *Lovett*, 328 U. S. 303 (1946). Two other decisions not involving a bill of attainder analysis contain an inquiry into legislative purpose or motive of the type that O'Brien suggests we engage in in this case. *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 169–184 (1963); *Trop* v. *Dulles,* 356 U. S. 86, 95–97 (1958). The inquiry into legislative purpose or motive in *Kennedy* and *Trop,* however, was for the same limited purpose as in the bill of attainder decisions—*i. e.,* to determine whether the statutes under review were punitive in nature. We face no such inquiry in this case. The ,1965 Amendment to § 462 (b) was clearly penal in nature, designed to impose criminal punishment for designated acts.

just such a tax. Similarly, in *Gomillion,* the Court sustained a complaint which, if true, established that the "inevitable effect," 364 U. S., at 341, of the redrawing of municipal boundaries was to deprive the petitioners of their right to vote for no reason other than that they were Negro. In these cases, the purpose of the legislation was irrelevant, because the inevitable effect—the "necessary scope and operation," *McCray* v. *United States,* 195 U. S. 27, 59 (1904)—abridged constitutional rights. The statute attacked in the instant case has no such inevitable unconstitutional effect, since the destruction of Selective Service certificates is in no respect inevitably or necessarily expressive. Accordingly, the statute itself is constitutional.

We think it not amiss, in passing, to comment upon O'Brien's legislative-purpose argument. There was little floor debate on this legislation in either House. Only Senator Thurmond commented on its substantive features in the Senate. 111 Cong. Rec. 19746, 20433. After his brief statement, and without any additional substantive comments, the bill, H. R. 10306, passed the Senate. 111 Cong. Rec. 20434. In the House debate only two Congressmen addressed themselves to the Amendment— Congressmen Rivers and Bray. 111 Cong. Rec. 19871, 19872. The bill was passed after their statements without any further debate by a vote of 393 to 1. It is principally on the basis of the statements by these three Congressmen that O'Brien makes his congressional-"purpose" argument. We note that if we were to examine legislative purpose in the instant case, we would be obliged to consider not only these statements but also the more authoritative reports of the Senate and House Armed Services Committees. The portions of those reports explaining the purpose of the Amendment are reproduced in the Appendix in their entirety. While both reports make clear a concern with the "defiant"

destruction of so-called "draft cards" and with "open" encouragement to others to destroy their cards, both reports also indicate that this concern stemmed from an apprehension that unrestrained destruction of cards would disrupt the smooth functioning of the Selective Service System.

## IV.

Since the 1965 Amendment to § 12 (b)(3) of the Universal Military Training and Service Act is constitutional as enacted and as applied, the Court of Appeals should have affirmed the judgment of conviction entered by the District Court. Accordingly, we vacate the judgment of the Court of Appeals, and reinstate the judgment and sentence of the District Court. This disposition makes unnecessary consideration of O'Brien's claim that the Court of Appeals erred in affirming his conviction on the basis of the nonpossession regulation.[31]

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of these cases.

## APPENDIX TO OPINION OF THE COURT.

PORTIONS OF THE REPORTS OF THE COMMITTEES ON ARMED SERVICES OF THE SENATE AND HOUSE EXPLAINING THE 1965 AMENDMENT.

The "Explanation of the Bill" in the Senate Report is as follows:

"Section 12 (b)(3) of the Universal Military Training and Service Act of 1951, as amended, provides, among other things, that a person who forges, alters, or changes

---

[31] The other issues briefed by O'Brien were not raised in the petition for certiorari in No. 232 or in the cross-petition in No. 233. Accordingly, those issues are not before the Court.

a draft registration certificate is subject to a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. There is no explicit prohibition in this section against the knowing destruction or mutilation of such cards.

"The committee has taken notice of the defiant destruction and mutilation of draft cards by dissident persons who disapprove of national policy. If allowed to continue unchecked this contumacious conduct represents a potential threat to the exercise of the power to raise and support armies.

"For a person to be subject to fine or imprisonment the destruction or mutilation of the draft card must be 'knowingly' done. This qualification is intended to protect persons who lose or mutilate draft cards accidentally." S. Rep. No. 589, 89th Cong., 1st Sess. (1965). And the House Report explained:

"Section 12 (b)(3) of the Universal Military Training and Service Act of 1951, as amended, provides that a person who forges, alters, or in any manner changes his draft registration card, or any notation duly and validly inscribed thereon, will be subject to a fine of $10,000 or imprisonment of not more than 5 years. H. R. 10306 would amend this provision to make it apply also to those persons who knowingly destroy or knowingly mutilate a draft registration card.

"The House Committee on Armed Services is fully aware of, and shares in, the deep concern expressed throughout the Nation over the increasing incidences in which individuals and large groups of individuals openly defy and encourage others to defy the authority of their Government by destroying or mutilating their draft cards.

"While the present provisions of the Criminal Code with respect to the destruction of Government property

may appear broad enough to cover all acts having to do with the mistreatment of draft cards in the possession of individuals, the committee feels that in the present critical situation of the country, the acts of destroying or mutilating these cards are offenses which pose such a grave threat to the security of the Nation that no question whatsoever should be left as to the intention of the Congress that such wanton and irresponsible acts should be punished.

"To this end, H. R. 10306 makes specific that knowingly mutilating or knowingly destroying a draft card constitutes a violation of the Universal Military Training and Service Act and is punishable thereunder; and that a person who does so destroy or mutilate a draft card will be subject to a fine of not more than $10,000 or imprisonment of not more than 5 years." H. R. Rep. No. 747, 89th Cong., 1st Sess. (1965).

Mr. Justice Harlan, concurring.

The crux of the Court's opinion, which I join, is of course its general statement, *ante,* at 377, that:

"a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."

I wish to make explicit my understanding that this passage does not foreclose consideration of First Amendment claims in those rare instances when an "incidental" restriction upon expression, imposed by a regulation which furthers an "important or substantial" governmental interest and satisfies the Court's other criteria, in practice has the effect of entirely preventing a "speaker"

from reaching a significant audience with whom he could not otherwise lawfully communicate. This is not such a case, since O'Brien manifestly could have conveyed his message in many ways other than by burning his draft card.

MR. JUSTICE DOUGLAS, dissenting.

The Court states that the constitutional power of Congress to raise and support armies is "broad and sweeping" and that Congress' power "to classify and conscript manpower for military service is 'beyond question.' " This is undoubtedly true in times when, by declaration of Congress, the Nation is in a state of war. The underlying and basic problem in this case, however, is whether conscription is permissible in the absence of a declaration of war.[1] That question has not been briefed nor was it presented in oral argument; but it is, I submit, a question upon which the litigants and the country are entitled to a ruling. I have discussed in *Holmes* v. *United States, post,* p. 936, the nature of the legal issue and it will be seen from my dissenting opinion in that case that this Court has never ruled on

---

[1] Neither of the decisions cited by the majority for the proposition that Congress' power to conscript men into the armed services is " 'beyond question' " concerns peacetime conscription. As I have shown in my dissenting opinion in *Holmes* v. *United States, post,* p. 936, the *Selective Draft Law Cases,* 245 U. S. 366, decided in 1918, upheld the constitutionality of a conscription act passed by Congress more than a month after war had been declared on the German Empire and which was then being enforced in time of war. *Lichter* v. *United States,* 334 U. S. 742, concerned the constitutionality of the Renegotiation Act, another wartime measure, enacted by Congress over the period of 1942–1945 (*id.,* at 745, n. 1) and applied in that case to excessive war profits made in 1942–1943 (*id.,* at 753). War had been declared, of course, in 1941 (55 Stat. 795). The Court referred to Congress' power to raise armies in discussing the "background" (334 U. S., at 753) of the Renegotiation Act, which it upheld as a valid exercise of the War Power.

the question. It is time that we made a ruling. This case should be put down for reargument and heard with *Holmes* v. *United States* and with *Hart* v. *United States, post,* p. 956, in which the Court today denies certiorari.[2]

The rule that this Court will not consider issues not raised by the parties is not inflexible and yields in "exceptional cases" (*Duignan* v. *United States,* 274 U. S. 195, 200) to the need correctly to decide the case before the court. *E. g., Erie R. Co.* v. *Tompkins,* 304 U. S. 64; *Terminiello* v. *Chicago,* 337 U. S. 1.

In such a case it is not unusual to ask for reargument (*Sherman* v. *United States,* 356 U. S. 369, 379, n. 2, Frankfurter, J., concurring) even on a constitutional question not raised by the parties. In *Abel* v. *United States,* 362 U. S. 217, the petitioner had conceded that an administrative deportation arrest warrant would be valid for its limited purpose even though not supported by a sworn affidavit stating probable cause; but the Court ordered reargument on the question whether the warrant had been validly issued in petitioner's case. 362 U. S., at 219, n., par. 1; 359 U. S. 940. In *Lustig* v. *United States,* 338 U. S. 74, the petitioner argued that an exclusionary rule should apply to the fruit of an unreasonable search by state officials solely because they acted in concert with federal officers (see *Weeks* v. *United States,* 232 U. S. 383; *Byars* v. *United States,* 273 U. S. 28). The Court ordered reargument on the question raised in a then pending case, *Wolf* v. *Colorado,* 338 U. S. 25: applicability of the Fourth Amendment to the States. U. S. Sup. Ct. Journal, October Term, 1947, p. 298. In *Donaldson* v. *Read Magazine,* 333 U. S. 178, the only issue presented,

---

[2] Today the Court also denies stays in *Shiffman* v. *Selective Service Board No. 5,* and *Zigmond* v. *Selective Service Board No. 16, post,* p. 930, where punitive delinquency regulations are invoked against registrants, decisions that present a related question.

according to both parties, was whether the record contained sufficient evidence of fraud to uphold an order of the Postmaster General. Reargument was ordered on the constitutional issue of abridgment of First Amendment freedoms. 333 U. S., at 181–182; Journal, October Term, 1947, p. 70. Finally, in *Musser* v. *Utah,* 333 U. S. 95, 96, reargument was ordered on the question of unconstitutional vagueness of a criminal statute, an issue not raised by the parties but suggested at oral argument by Justice Jackson. Journal, October Term, 1947, p. 87.

These precedents demonstrate the appropriateness of restoring the instant case to the calendar for reargument on the question of the constitutionality of a peacetime draft and having it heard with *Holmes* v. *United States* and *Hart* v. *United States.*