**UNITED STATES of America**

**v.**

**Peter Niven KIGER.**

**No. 66 Cr. 452.**

United States District Court
S. D. New York.

March 13, 1969.

Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, for the United States. Charles B. Updike, John R. Robinson, Asst. U. S. Attys., of counsel.

Marvin M. Karpatkin, Alan H. Levine, New York City, for defendant.

## OPINION

FREDERICK van PELT BRYAN, District Judge:

Defendant Peter Niven Kiger was tried before me without a jury on an indictment charging him with knowingly destroying and multilating his Selective Service Notice of Classification certificate in violation of § 462(b) (3) of the Universal Military Training and Service Act of 1948, as amended, 50 App.U.S.C. § 462(b) (3). At the conclusion of the trial, decision was reserved. This section of the Universal Military Training and Service Act of 1948, as amended in 1965, provides that a crime is committed by "any person * * * who forges, alters, knowingly destroys, knowingly mutilates, or in any manner changes" any certificate issued pursuant to the provisions of the Universal Military Training and Service Act and the rules and regulations and directions made pursuant thereto. A Notice of Classification (SS Form 110) is such a certificate. 32 C.F.R. § 1623.4.

The evidence adduced at trial is for all practical purposes undisputed. It establishes beyond a reasonable doubt that on March 24, 1966, at the office of the Committee for Non-violent Action, 5 Beekman Place, New York City, Kiger burned his Notice of Classification [1] and that he did so knowingly and wilfully. The only questions in the case relate to the defenses raised by Kiger.

Kiger urges that he cannot be found guilty of a violation of § 462(b), as charged, for three reasons. He contends first, that there was "implied condonation" by his Local Board of his conduct in thus burning his draft card which would render a conviction for such conduct a denial of due process; second, that he was ineligible for the draft when he burned his card and therefore under the balancing test of United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), interference with his First Amendment rights of symbolic free speech is no longer justified; and third, that the act of burning his draft card was a necessary means of obtaining access to the mass media for the expression of his views and was thus constitutionally protected by the First Amendment.

## I

In January, 1966, while Kiger was classified I–O (Conscientious Objector), he wrote a letter to his Local Board in Indiana, reading in pertinent part as follows:

"Please send me a new classification card (I–Y I believe). I do not know the whereabouts of the one which you sent to my home in Dunreith, Ind. in 1963; and I wish to burn one in sympathy with other people who have done so."

The Local Board then prepared a Notice of Classification card labeled "Duplicate", dated January 13, 1966, reflecting Kiger's current I–O classification rather than the I–Y classification in which he apparently thought himself placed. The duplicate card was mailed to Kiger on the same day without any accompanying letter or other communication. There was no further communication of any kind from the Selective Service or any of its representatives with reference to Kiger's letter or his statement that he intended to burn his card

---

1. The card burned by Kiger was a duplicate of his Notice of Classification. It was the only duplicate card ever issued to him and he no longer had his original Notice of Classification in his possession.

up to March 24, 1966, when the burning of the duplicate card took place.

Kiger contends that the action of the Local Board in sending him the duplicate card without any comment on his statement that he wished to burn it constituted "implied condonation" of his conduct in burning the card, which is tantamount to entrapment. He emphasizes the contrast between this procedure and the action taken by the Local Board in 1961, when he attempted to return his draft card as "part of a protest against preparations for war by the United States Government and other governments and countries", and stated he was willing to face up to the penalties for such illegal acts. At that time the Board advised him that he must carry his registration and classification certificates so as not to be in violation of law.

He also argues that, since the constitutionality of the 1965 amendment to the Universal Military Training and Service Act, which made knowing destruction or mutilation of a draft card a crime, had not yet been passed on by any appellate court, the validity of the statute was then "uncertain". He urges that it follows from this that the Local Board's act of providing the duplicate card without comment, knowing he wished to burn it, implied that it thought his contemplated conduct was constitutionally protected.

Kiger relies principally on Raley v. Ohio, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed. 2d 1344 (1959), and Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), to support this defense. These cases are clearly distinguishable and defendant's reliance on them is misplaced.

In *Raley*, the defendants-appellants, claiming the privilege against self-incrimination granted by the Ohio Constitution, had refused to answer questions propounded by the Ohio Un-American Activities Commission. They were informed by the Commission that they had a right to rely on the privilege. Nevertheless, they were convicted by the state courts for contempt for refusing to answer the questions.

The Ohio Supreme Court affirmed the convictions. It held that defendants were presumed to know the Ohio law to the effect that the Ohio immunity statute deprived them of the protection of the privilege against self-incrimination and they therefore had committed an offense in refusing to answer the questions as to which they had asserted the privilege.

The United States Supreme Court reversed, holding that the convictions violated the due process clause of the Fourteenth Amendment. The Court stated, "After the Commission, speaking for the State, acted as it did, to sustain the Ohio Supreme Court's judgment would be to sanction an indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State had clearly told him was available to him." 360 U.S. at 425–426, 79 S.Ct. at 1260.

In Cox v. Louisiana, supra, the appellant was convicted for demonstrating "near" the courthouse, in violation of a state statute which proscribed such demonstrations when done with the intent to interfere with, obstruct or impede the administration of justice or to influence any judge, juror, witness or court officer in the discharge of his duty.

The Supreme Court found that the term "near", as used in the statute was not self-explanatory, and that demonstrators would rely on on-the-spot administrative determination as to how near the courthouse a demonstration might take place. The police had given permission for the demonstration to be held across the street from the courthouse, and no suggestion or recommendation was made by the police that it should be moved to a greater distance.

The Court deemed the situation in Cox to be analogous to that in Raley, and the conviction was reversed. It held that to sustain a conviction for demonstrating where police officials said the demonstration could take place would be "an indefensible sort of entrapment by the State" and a violation of due process.

In both Raley and Cox affirmative statements were made to the defendants by responsible state or local officials to the effect, in substance, that defendants had the right to act as they did. The defendants acted in justifiable reliance thereon. Nevertheless, despite such representations and reliance, the defendants were prosecuted and convicted for the very acts which were the subject of the representations. Thus, it could be said that they were misled into believing that their course of conduct was not in violation of law and that they would not be prosecuted therefor, when in fact the contrary was true.[2]

The situation in the case at bar is quite different. No representations of any kind were made by the Local Board or the Selective Service System. The Local Board only did what it was required to do when it sent the duplicate card to Kiger.[3] It was under no obligation to answer the statements made in his letter, and no implication that it approved his proposed course of conduct can be drawn from its failure to do so. Nor does the fact that on a previous occasion it had advised him to carry his draft card so as not to be in violation of law impose on it any obligation to comment or admonish him on the later occasion.

Moreover, it is amply plain from the record in this case that Kiger was fully aware at the time he burned his draft card of the amended statute making such an act a crime and of the fact that his act was criminal. Indeed, he has stressed that the criminality of what he did was one factor which he hoped would help to publicize his protest.

■ His defense is not aided by the fact that the constitutionality of the amended statute had not been passed upon by any appellate court at the time he burned his card. No one can escape criminal liability for the violation of a statute on the ground that there may be doubts as to its constitutionality. Here, of course, the statute was held constitutional in United States v. O'Brien, supra.

■ There is nothing here which savors of "implied condonation" or of anything which is tantamount to entrapment. The defense is devoid of merit.

## II

■ The second defense is based upon a distinction between Kiger's draft status and that of the defendant in the O'Brien case. O'Brien was under the age of 22 at the time he burned his draft card, whereas Kiger was classified I–O, was over 26, and in selection group 5.[4] The stipulation of facts in evidence in this case states:

"On August 12, 1964 Kiger was reclassified I–O and placed in selection group 5. A new Notice of Classification was mailed to Kiger on the same date. From that date until the date of this stipulation [January 17, 1969], the national draft quotas have been such that no person in selection group 5 has been ordered for induction or alternative civilian service. In April, 1968, Local Board 146, New Castle, Indiana [Kiger's Local Board] ordered one person from selection group 4 for induction after which 9 persons were left in selection group 4."

From this Kiger argues that there was no reasonable ground for anticipating that he would be called for induction and that the statute, if applied to him, would be unconstitutional.

In United States v. O'Brien, supra, the Supreme Court upheld the constitutionality of the draft card mutilation amendment and rejected the argument that the

---

2. The defendant also refers to United States v. Sansone, 385 F.2d 247 (7th Cir. 1967). The decision in Sansone was grounded upon the United States Customs Agents' failure to follow the requirements of a federal regulation. See also United States v. Jones, 368 F.2d 795 (2d Cir. 1966). *Sansone* is of no relevance here.

3. See 32 C.F.R. § 1623.7.

4. See 32 C.F.R. § 1631.7.

burning of a draft card was symbolic speech entitled to First Amendment protections. The Court applied the following standard: "A government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedom is no greater than is essential to the furtherance of that interest." 391 U.S. at 377, 88 S.Ct. at 1679. It held that the certificate served valid purposes of the Government, id. at 378–380, 88 S.Ct. 1673 and that Congress was therefore entitled to make mutilation of the certificate a criminal offense.

Kiger's position is that the difference in his draft status from that of the O'Brien defendant requires a different result under the balancing test and that the statute as applied to him violates his First Amendment rights.

This contention is without merit. In the first place, Kiger, having been classified as I–Y,[5] was liable for training and service until he reached age 35.[6] Thereafter classified as I–O (Conscientious Objector), he was liable for civilian service in any emergency up to that age. Even though the probability of his being called may have been slight, the Selective Service System was required to keep track of him until he reached 35. Thus the purposes served by the statute, as found in O'Brien, apply to Kiger.

Moreover, in United States v. Edelman, 384 F.2d 115 (2d Cir. 1967), cert. denied sub nom. Cornell v. United States, 392 U.S. 904, 88 S.Ct. 2051, 20 L.Ed.2d 1363 (1968) (a pre-O'Brien case), the Court of Appeals of this Circuit rejected a

similar argument. Prior to Edelman, the court in United States v. Miller, 367 F.2d 72 (2d Cir. 1966), cert. denied, 386 U.S. 911, 87 S.Ct. 855, 17 L.Ed.2d 787 (1967), reh. denied, 392 U.S. 917, 88 S.Ct. 2049, 20 L.Ed.2d 1378 (1968), had laid down the balancing test thereafter followed in O'Brien.

In Miller the defendant was classified I–A. In Edelman two of the defendants were classified 4–F and one was I–O. In addition, one of the defendants was over the age of 26. It was urged in Edelman that the balancing sheet should produce a different result where the interest of the Selective Service System in keeping track of a registrant was less important than in the case of a registrant subject to immediate call. In affirming the conviction, the Court of Appeals rejected this argument, holding that "the Selective Service System might be just as interested in knowing who is not subject to call at a time of emergency as it would be in knowing who is subject to call." United States v. Edelman, 384 F.2d at 117.

The second defense is also without merit.

### III

The third defense is based on a novel theory of First Amendment protections. According to the defendant, his First Amendment rights include not only the right to speak freely but also the right to use such means as may be necessary to obtain access to the mass media of communication for the ideas he wishes to express. He claims that only by burning his draft card could he get his ideas widely publicized by the mass media, and that therefore the application of the statute to him would violate his First Amendment rights.

5. 32 C.F.R. § 1622.17. Class I-Y includes a registrant who would be classified in Class I-A, I-A-O or I-O "but for the fact that he is found under applicable physical, mental and moral standards to be not currently qualified for service in the Armed Services and who would be qualified for such service in time of war or

national emergency declared by the Congress." The I-Y classification was made while defendant was serving a prison term imposed for refusal to perform civilian service as a conscientious objector.

6. See 50 U.S.C.App. § 456(h) (2) and 32 C.F.R. § 1622.1(a) (3) (ii).

The defendant and two of his associates burned or mutilated their draft cards at a press conference which they called and which was attended by numerous representatives of the mass media of communication. The events which occurred were reported fully in three New York daily newspapers and on major TV and radio stations and thus reached a large audience. One of the defendant's major motivations in burning his draft card was to assure that his protest reached a wide audience through the mass communications media.

Defendant was permitted to bring out at trial that he and his associates did not have sufficient funds available for an advertising of their views in the mass media; that he had been unable to obtain any substantial mass media coverage for his views though over a long period he had distributed literature and made speeches against war; that the newsworthiness of the draft card burning event lay in large part in the fact that the participants were committing a criminal act; that one of the main factors which determines newsworthiness on TV is dramatic impact on the television audience, and that it was not the policy of CBS News, at least, to accept on-the-spot advertising on controversial subjects.

Defendant argues that these facts demonstrate that he could not have obtained any substantial access to the mass media without the drastic action of publicly burning his draft card and that, therefore, his conduct is entitled to First Amendment protection as "effective" free speech and he cannot be held criminally liable therefor.

No cases are cited which support this novel theory, and I know of none. Defendant, however, refers to the brief concurring opinion of Mr. Justice Harlan in United States v. O'Brien, supra. In agreeing with the principles enunciated by the majority, Mr. Justice Harlan voiced the following caveat:

"I wish to make explicit my understanding that this passage does not foreclose consideration of First Amendment claims in those rare instances when an 'incidental' restriction upon expression, imposed by a regulation which furthers an 'important or substantial' governmental interest and satisfies the Court's other criteria, in practice has the effect of entirely preventing a 'speaker' from reaching a significant audience with whom he could not otherwise lawfully communicate. This is not such a case, since O'Brien manifestly could have conveyed his message in many ways other than by burning his draft card." 391 U.S. at 388–389, 88 S.Ct. at 1685 (concurring opinion).

I see nothing in Mr. Justice Harlan's concurrence which supports defendant's contention. Plainly, Mr. Justice Harlan did not view his caveat as applying to O'Brien himself, since he points out that "O'Brien manifestly could have conveyed his message in many ways other than by burning his draft card." Kiger, like O'Brien, had available lawful means to convey his message. Nevertheless, he chose to do so by deliberately committing what he knew to be a criminal act, and he must take the consequences.

Perhaps, as indicated in a recent Harvard Law Review article,[7] the whole subject of access to the mass media should be reexamined from the legislative, administrative and judicial viewpoints. But this is not to say that a person is free to violate a criminal statute in order to get his views carried in the press and on the air. The standards laid down in O'Brien are applicable to the case at bar, and under those standards defendant's conduct in this case is not entitled to the protections of the First Amendment.

█ It has been proven beyond a reasonable doubt that defendant wilfully and knowingly burned his draft card in violation of 50 App.U.S.C. § 462(b) (3). I find defendant guilty as charged.

7. J. Barron "Access to the Press—A New First Amendment Right", 80 Harv.L.Rev. 1641 (1967).