Thomas S. Agresta, J.
This action for a permanent injunction
“ 1. Restraining and enjoining each and all of the defendants and all other persons receiving notice of this injunction from congregating or assembling within or adjacent to or threatening *115 to congregate or assemble within or adjacent to any of the plaintiff’s academic or administrative buildings, recreation rooms or athletic facilities or in any corridors, stairways, doorways and entrances thereto on the campus of Queensborough Community College, in such manner as to disrupt or interfere with normal functions conducted by plaintiff in such place or to block, hinder, impede or interfere with ingress to or egress from any such properties by plaintiff’s faculty, administrators, students, employees or guests thereat;
“ 2. Restraining and enjoining each and all of the defendants and all other persons receiving notice of this injunction from creating or broadcasting or threatening to create or broadcast on plaintiff’s Queensborough Community College campus or in the streets adjacent thereto, any loud or excessive noise that hinders, impedes, prevents or interferes with the conduct of normal activities by members of the College community;
“ 3. Restraining and enjoining each and all of the defendants and all other persons receiving notice of this injunction from employing force or violence, against persons or property on plaintiff’s Queensborough Community College campus;
“ 4. Restraining and enjoining each and all of the defendants and all other persons receiving notice of this injunction from threatening to do or inciting or counselling others or conspiring with others to do any of the above-mentioned acts; and
“ 5. Granting plaintiff such other relief as may be proper.” was tried before me at Special Term, Part III. Plaintiff, Board of Higher Education of the City of New York, governs and administers Queensborough Community College (hereinafter called Queensborough). Defendants Auerbach, Tivoli, Raps, Kanin, Brown, Wininger, Reed, Spiller and Moore are duly enrolled students at Queensborough; defendants Faigelman, McDonald and Silberman, at the time of the institution of this action, were nontenured members of the instructional staff at Queensborough; defendant Leslie Joyce Silberman is the wife of Professor Silberman; defendant Students for a Democratic Society, Queensborough Community College Chapter, is a chartered campus organization; and defendant Ad Hoc Faculty-Student Coalition to End Political Suppression is an unchartered organization on the campus of Queensborough.
The events that have given rise to this action are but another manifestation of the unrest on our college campuses today. The facts that I have adduced after a seven-day trial can be summarized as follows:
On April 18, 1969, shortly after noon, an authorized outdoor rally was held on the Queensborough campus and immediately *116 thereafter many of the participants in that rally entered the Library Administration Building and began a “ sit-in ” on the fourth floor. Thereafter, at about 9:00 p.m'. on April 18, 1969 the President of Queensborough informed the students that they were subject to arrest on criminal trespass charges in the second degree and at about 9:00 p.m. over 100 members of the New York City Police Department, Tactical Patrol Force, assembled near the campus. On or about that time, the buildings were vacated.
On April 21, 1969 an order to show cause was signed by a Justice of this court made returnable on April 23 which provided, inter alia, that pending the hearing of the motion for a temporary injunction defendants, and all other persons receiving notice of the injunction, should cease from activities which tended to ‘ ‘ disrupt or interfere with normal functions ’ ’ on the campus.
Thereafter on April 21, shortly after the noon hour, anywhere from 400 to 600 people re-entered the Library Administration Building and ‘ ‘ sat in ” in the lounge area located on the fourth floor. At about 5:30 p.m., service of the order to show cause, which contained the temporary restraining order, was made on those who had occupied the lounge. They left the Library Administration Building but returned at 7:15 p.m. and at that time the “ sit-in ” began in earnest and was to last until May 7.
After hearing voluminous testimony by Kurt Schmeller, President of Queensborough Community College, his assistant, Miss Eleanor Pam, and testimony by many members of the faculty and many of the defendants, I make the following findings which are material and necessary on the question of whether an injunction should issue.
I find that those who “ sat in” on the fourth floor of the Library Administration Building remained there after the normal closing hours of the building even though they were requested to remove themselves and that their motivation for sitting in in the building was their being informed that an English professor, the defendant Donald Silberman, would not be reappointed for the following year.
I find that during the ‘ ‘ sit-in ’ ’, the students used loud amplification systems, played guitars and generally disrupted the work being carried on in the other offices on the fourth floor, which included the President’s office, the Registrar’s office, the Bursar’s office and the Admissions office.
I find that even though the students made an effort to keep the area clear and to keep it clean, cigarette butts often could be found on the floor and there were burns in the carpet. Furthermore, at certain times during the course of the “ sit-in ”, *117 administration personnel were abused by profanities. The certificate of occupancy for the fourth floor area, which was used by those who ‘ ‘ sat in ’ limited occupation to 100 people, the number of people normally employed on that floor, and I find that at many times this number was exceeded by the participants alone, particularly during performances by well-known entertainers brought in by the organizers of the “ sit-in ” to “ entertain ” during the course of the occupation of the fourth floor. This excessive number of people caused building violations to issue against the university.
On April 28, 1969, a decision of a Justice of this court continued the temporary restraining order which, inter alia, restrained defendants from disrupting or interfering with the normal functions of the university and from employing force or violence against persons or property on the campus. However, despite this order, the “ sit-in” continued and by May 7 substantial destruction of university property occurred. At that time, the participants of the “ sit-in ” were apprised that the police were assembling to physically remove them from the buildings and some of the participants piled office furniture in the stairways, ripped out telephones and caused substantial other destruction of university property.
The fundamental question presented is whether this court has the power to issue the injunction sought. I hold that this court does have that power and that a permanent injunction, limited in its terms as indicated below, shall issue for the following reasons:
The proven conduct of the defendants constitutes, among other wrongs, a continuous trespass. It is beyond dispute in this jurisdiction that a court of equity, under certain circumstances, has jurisdiction to enjoin a continuous trespass. (Coatsworth v. Lehigh Valley R. R. Co., 156 N. Y. 451; Wheelock v. Noonan, 108 N. Y. 179; Poughkeepsie Gas Co. v. Citizens’ Gas Co., 89 N. Y. 493; Garvey v. Long Island R.R. Co., 159 N. Y. 323; Van De Carr v. Schloss, 277 App. Div. 475; see, also, the following treatises: 4 Pomeroy, Equity Jurisprudence [5th ed.], § 1357; 1 High, Injunctions [4th ed.], § 697; 43 C. J. S., Injunctions, § 57, p. 521.) As was stated by Mr. Justice Chase, ‘ ‘ Where a trespass is of a continuous nature a person has a right to invoke the .restraining order of a court of equity to prevent the same, and in an action for that purpose the court can, and should, grant all the relief that the nature of the action and the facts demand.” (Sadlier v. City of New York, 185 N. Y. 408, 413.) The factors which guide the court are (1) the irreparability of the injuries; (2) the inadequacy of the remedy at law *118 and (3) whether injunctive relief will avoid a multiplicity of actions. (Williams v. New York Cent. R.R. Co., 16 N. Y. 97, and 1 High, Injunctions, § 697.)
There can be no question that defendants have caused irreparable injury both to the facilities of their college and to its normal educational and administrative procedures and that the remedy at law is inadequate in that a multiplicity of law actions will be needed to give plaintiff a remedy and that such a remedy would, in reality, afford no relief against continued disruption of the campus facilities. The mere fact that a permanent injunction has never before been sought in this jurisdiction against such activities does not defeat plaintiff’s application. (See Mendenhall v. School Dist. No. 83, 76 Kan. 173.) The rule as set forth in a leading treatise is “It is not a fatal objection [to the granting of an injunction] that the use of the writ for the particular purpose for which it is sought is novel.” (43 C. J. S., Injunctions, 429; see, also, Unity Contract Bridge Club v. Wallander, 187 Misc. 23.) The extension of the doctrine of injunctive relief against continuous trespass to this novel situation constitutes the adaptation of a traditional remedy to a new situation which, of course, is in the best tradition of equity jurisprudence. It is this ability of our law to so adapt that has made it survive over the centuries.
Defendants contend, however, that injunctive relief does not lie because (1) a public facility is involved and (2) equity will not enjoin criminal acts. This court does not agree with the first contention. In County Court of Harrison County v. West Virginia Air Serv. (132 W. Va. 1), the Supreme Court of Appeals of West Virginia, in an action by the county as the owner of a public airport to restrain the defendant lessee from the further use of the airport after its lease had expired, held that where an injunction is sought against one who trespasses on a public facility there is even greater reason for its issuance than when private facilities are involved. This court agrees with the reasoning of that opinion.
Defendants also contend that because a public university is involved here, its students as members of the public somehow possess the right to “ occupy its facilities ”. A similar contention was presented to the court in People v. Martinez (43 Misc 2d 94), which was a criminal action against four defendants who entered police headquarters to see the Police Commissioner of the City of New York and sat on the floor of the public corridors and refused to leave when requested. The court stated (p. 97):
*119 11 The Police Headquarters building was thus property owned by the City of New York. £ Property is ownership; the unrestricted and exclusive right to a thing; the right to dispose of a thing in every legal way, to possess it, to use it, and to exclude every one else from interfering with it ’ (Black’s Law Dictionary [3d ed.], p. 1447). A public building is one £ belonging to or used by the public for the transaction of public or quasi public business ’ (Black’s Law Dictionary, ibid., p. 1460).
£ £ The words £ public property ’ and ‘ public building ’, as interpreted by the defendants in their brief are ill-defined. Their meanings may not be distorted into an exercise in semantics. The public owns such property only in a very broad and general sense. The deed to such property is not in the name of each individual citizen in this city, either as joint tenants or tenants in common.
££ The title to Police Headquarters is in a municipal corporation known as the City of New York. Such so-called public building, especially one which houses so vital a functioning department as the Police Department, may not be used in a manner which suits the whim or caprice of every citizen, without reducing our government to chaos (Bi-Metallic Co. v. Colorado, 239 U. S. 441). There is no blanket right to every citizen in his use of this type of property. The rights of others must always be considered (Johnson v. May, 189 App. Div. 196, 204).
“In a comparable situation, the Appellate Division, Third Department, said: £ School buildings are not public places in the sense that the use thereof may be demanded as a matter of right by any individual or organization as a forum for public or private discussions ’ (Ellis v. Allen, 4 A D 2d 343, 344).”
Nor does this court agree with defendants’ second contention, i.e., that this court has no power to enjoin the acts because ££ equity will not enjoin the commission of a crime.” In the landmark case of People ex rel. Bennett v. Laman (277 N. Y. 368, 376, 381, 384), the Court of Appeals of this State stated: “ That a court of equity will not undertake the enforcement of the criminal law, and will not enjoin the commission of a crime is a principle of equity jurisprudence that is settled beyond any question. There can equally be no doubt that the criminal nature of an act will not deprive equity of the jurisdiction that would otherwise attach. (Cranford v. Tyrrell, 128 N. Y. 341; Davis v. Zimmerman, 91 Hun, 489, 492; Matter of Debs, 158 U. S. 564, 593.) Whether or not the act sought to be enjoined is a crime, is immaterial. Equity does not seek to enjoin it simply because it is a crime; it seeks to protect some proper interest. If the interest sought to be protected is one of which *120 equity will take cognizance, it will not refuse to take jurisdiction on the ground that the act which invades that interest is punishable by the penal statutes of the State. Equity does not pretend to punish the perpetrator for the act; it attempts to protect the right of the party (here the People) seeking relief, and to prevent the performance of the act or acts, which here may injure many. * * *
“ We have pointed out that the fact that a criminal penalty is imposed for the performance of such acts will not deprive equity of its jurisdiction. In equity the court will consider the criminality of the act only to determine whether, under the particular circumstances, equitable intervention is necessary to give adequate protection to the interest invaded or whether justice will be best served by relegating the parties to the criminal court. * * *
‘ ‘ They allege facts showing that the acts of defendant imperil the health of the people of the community, and will continue to cause irreparable injury to the health of the people and perhaps to their lives. The relators invoke only the ordinary powers of a court of equity. The power of the court to restrain acts which are dangerous to human life, detrimental to the public health and the occasion of great public inconvenience and damage is one that is possessed by all courts of equity. (Health Dept. v. Purdon, supra.) Enough has been shown here, which if proven upon the trial, will warrant the issuance of an injunction. ’ ’ (See, also, Lanvin Parfums v. Le Dans, Ltd., 9 N Y 2d 516.)
Here, too, the acts sought to be enjoined constitute a danger to human life and property and occasion “ great public inconvenience ’ ’ and the interest sought to be protected is one of which equity takes cognizance. Accordingly, equitable jurisdiction attaches even though defendants’ acts may be incidentally criminally punishable.
Defendants’ final contention is that somehow their activities on this campus were and are constitutionally protected and, therefore, equity may not enjoin them. Such a contention, i.e., that one is privileged to disrupt a college campus was put to rest in Hutt v. Brooklyn Coll. of City of N. Y. (an unpublished opinion of the United States District Court, Eastern District, New York, dated Dec. 28, 1968) where the court stated: “ That the state may, in some cases, constitutionally punish conduct intended to express an idea or point of view, is not open to question. See, e.g., United States v. O’Brien, 391 U. S. 367, 88 S. Ct. 1673(1968). The Supreme Court has often rejected the proposition that ‘ people who want to propagandize pro *121 tests or views have a constitutional right to do so whenever and however and wherever they please * * * ’ Adderley v. Florida, 385 U. S. 39, 48, 87 S. Ct. 242, 247 (1966); Cox v. Louisiana, 379 U. S. 599, 85 S. Ct. 476 (1965). The admitted facts of this case indicate a willful trespass on College property, the exclusion of administrative personnel of the College and an intentional refusal by the plaintiffs to end their seizure and adverse holding of College property after being warned that they faced suspension or dismissal and even arrest for violating the rules of the College and the New York State trespass laws. Even assuming that the aforesaid conduct does combine 1 speech ’ elements with ‘ nonspeech ’ elements, nothing in the First Amendment forbids the State (or College authorities) from disciplining students who prevent others from access to College facilities. See Buttny v. Smiley, 281 F. Supp. 280 (D. Colo. 1968). A reasonable balancing of interest must reserve to the State (and the College) the power to preserve its facilities for their intended uses. The right to communicate does not include the right to confiscate.” (See, also, Grossner v. Trustees of Columbia Univ. in City of N. Y., 287 F. Supp. 535.)
Accordingly, this court is of the opinion that an injunction is to issue which is to be perpetual against defendants Students for a Democratic Society, the Ad Hoc Faculty-Student Coalition to End Political Suppression and Leslie Joyce Silberman and, as against defendants Donald J. Silberman, Faigelman, MacDonald and the student defendants, is to last until such time as they are no longer, as the case may be, faculty members or ^students at Queensborough Community College. The defendants and all others receiving notice of this injunction are enjoined from:
(1) Congregating or assembling within or adjacent to any of the plaintiff’s academic or administrative buildings, recreation rooms or athletic facilities or in any corridors, stairways, doorways and entrances thereto on the campus of Queens-borough Community College, in such manner as to disrupt or interfere with normal functions conducted by plainiff in such place or to block, hinder, impede or interfere with ingress to or egress from any such properties by plaintiff’s faculty, administrators, students, employees or guests thereat; and
(2) Employing force or violence against persons or property on plaintiff’s Queensborough Community College campus.
The issuance of such an injunction, limited to those activities which disrupt the normal activities at the college and to activities that tend to produce violence on the campus does not in any way offend any of the constitutional guarantees contained in *122 the First Amendment of the United States Constitution. This injunction in no way proscribes or circumvents constitutionally-protected activities. This court is well aware that the right to peacefully protest and to disseminate even those views that may be abhorrent to a majority of the populace is the cornerstone upon which our Constitution rests. However, where that protest, as here, becomes violent and, in essence, deprives others of their right to pursue their studies in a relatively tranquil atmosphere, that protest can no longer be privileged or protected if society itself and the rule of law which governs it is to survive.
The foregoing constitutes the decision of this court and all motions made at the trial with regard to the action for a permanent injunction are resolved in a manner consistent with this opinion.