LASSER, P.J.T.C.
This case involves the constitutional validity of the New Jersey boxing and wrestling media rights tax. N.J.S.A. 5:2A-20. Plaintiff, Titan Sports, Inc. (“Titan”), claims that the imposition of this tax by defendant Athletic Control Board (the *265 “board”) violates its rights under the First and Fourteenth Amendments as well as the Commerce Clause of the United States Constitution. Both parties have moved for summary judgment.
I.
BACKGROUND.

A. The Statutory Scheme.

The tax in issue was imposed as part of legislation regulating boxing, wrestling, kick boxing and combative sports. See N.J. S.A. 5:2A-1 et seq. The stated purposes of this legislation are to:
a. Protect the safety and well-being of participants in boxing, wrestling, kick boxing and combative sports exhibitions, events, performances and contests; and
b. Promote the public confidence and trust in the regulatory process and the conduct of boxing, wrestling, kick boxing and combative sports exhibitions, events, performances and contests. [N.J.S.A. 5:2A-2]
Generally, the act creates an Athletic Control Board to manage, control and supervise public boxing, wrestling, kick boxing and combative sports. The board’s responsibilities include issuing licenses, promulgating rules and regulations, and collecting license fees and taxes. N.J.S.A. 5:2A-7. The statute provides for two taxes. The first is a graduated tax on ticket sales[1]. N.J.S.A. 5:2A-20. The second, the tax in issue, is imposed on any gross income received from the “lease or sale of television, including cable television and closed circuit television, moving picture or radio rights, in connection with any such exhibition or performance” regulated under the act. This media rights tax is imposed on a declining basis, 5% on the first $50,000, 3% on the next $100,000, 2% on the next $100,000 and 1% on amounts in excess of $250,000, with a cap of $100,000 in *266 tax. Ibid. Both of these taxes must be paid within seven days of the conclusion of the event. Ibid. Taxes collected by the board are to be put in the state Athletic Control Board account, which is used for the necessary expenses of the board. N.J. S.A. 5:2A-19. Any surplus from the account is to be returned to the state general fund, and if additional funding is required for the board, it shall be available from the general fund. Ibid.

B. Titan Sports, Inc. and Professional Wrestling.

Titan is a Delaware corporation headquartered in Connecticut and authorized to do business in New Jersey. Titan, known popularly as the World Wrestling Federation (WWF), is engaged in the creation, production and performance of professional wrestling exhibitions throughout the world.
Titan has submitted affidavits of Linda McMahon, its executive vice president, and Gerald Morton, an expert on modern professional wrestling. These affidavits state that the struggle between the wrestlers is actually simulated, and that there is no real competition to win. Also according to the affidavits, the wrestlers play distinct characters or personas and act out moral sagas in a form of drama that includes “plots, subplots, characterization, theme improvisation, spectacle, acrobatic expression, critical expression, moral expression and political expression.” The board has not submitted any certification to the contrary.
On March 27, 1988, Titan held a wrestling exhibition, known as WrestleMania IV, in Atlantic City, New Jersey. Prior to the event Titan obtained an appropriate license from the board. Subsequent to the event, a tax on the sale of tickets to the event was duly paid to the board. During the exhibition, a video program was made which was distributed through various cable television operators, closed-circuit television theaters and television broadcasting networks around the world. All contractual arrangements for the distribution were made by mail from Titan’s corporate headquarters in Connecticut. Titan entered license agreements with 615 cable television operators to cablecast the program to pay-per-view customers throughout *267 the country. Twenty-two of these operators were located in New Jersey. Titan received approximately $5,973,358 on these transactions, of which $461,890 was from the New Jersey operators.
WrestleMania IV was also shown almost simultaneously on closed circuit TV at various theaters throughout the United States and Canada. Titan entered rental agreements for this showing with 129 theaters, nine of which are in New Jersey, and received $5,535,256.40 in ticket sales. Of that amount, $1,554,529 was from tickets sold to New Jersey patrons. Titan paid $15,545.29 in media rights tax.
WrestleMania IV was also broadcast via international television networks. These networks paid Titan $83,496. In addition, video replay rights of the program were sold to the 615 cable operators and a separate distributor.
The board imposed a media rights tax on WrestleMania IV in the amount of $61,639. Titan did not voluntarily pay the entire amount of the tax assessed, despite requests by the board. Therefore, on July 25, 1988, the board notified Titan that it would not be licensed to conduct further wrestling exhibitions in New Jersey until the tax was paid. The board also rescinded approval, pending payment of the tax, for two other live events scheduled to take place in New Jersey. Thereafter, Titan paid to the Athletic Control Board $61,639.
On April 2, 1989, Titan created and produced another live wrestling exhibition, known as WrestleMania V, also in Atlantic City, New Jersey. The media version of this event was disseminated in the same manner as WrestleMania IV. On May 8, 1989 Titan conducted another professional wrestling exhibition at the Meadowlands in New Jersey. Titan received $32,000 for the rights to cablecast this event at Madison Square Garden. On August 28, 1989 Titan created, performed and produced another wrestling exhibition, known as SummerSlam, at the Meadowlands. Media versions of this event were disseminated in substantially the same manner as WrestleMania IV and V.
*268 Unlike professional sports, the professional wrestlers who perform in modern exhibitions are independent entrepreneurs. “[W]restlers do not have agents, are not drafted, and do not sign long term contracts.” Morton and O’Brien, Wrestling to Rosslin’: Ancient Sport to American Spectacle, (1985) at 66. They are paid on a gross basis and are responsible for their own expenses. See id. at 61.
The board has submitted affidavits that several wrestlers have been injured while participating in events promoted by Titan and other wrestling promoters. In some cases, hospitalization was required. While the risks of this activity have been challenged in plaintiff’s brief, they have not submitted affidavits or depositions regarding the safety of the wrestlers. In fact, Professor Morton’s book, which was submitted by plaintiffs, states: “Injury is most obvious; all active wrestlers know physical pain and fear serious injuries that temporarily or permanently deprive them of work and income while adding up medical bills.” Id. at 66.

C. The Athletic Control Board.

The board consists of three public members, appointed by the Governor with consent of the Senate. Pursuant to its statutory authority to “exercise sole discretion, management, control, and supervision” over combative sports events, the board has promulgated comprehensive regulations. See N.J.A.C. 13:46-1.1 et seq. Among other things, these regulations govern the health and safety of wrestlers[2], provide for licensing of participants, promoters, referees, timekeepers, and announcers, and provide for mandatory medical and accident insurance to be paid by promoters. During the period from June 13, 1989 to January *269 29,1990, the board oversaw payment of claims by this mandatory insurance to wrestlers in the amount of $18,894.18.
Since the board was originally funded by a conditional appropriation by the state legislature, revenues must be periodically turned over to the general treasury. However, in no year since its inception has the board collected sufficient revenues to fund its operations.
II.

The First Amendment Claim.

Titan argues that the media rights tax impinges on its First Amendment rights because the tax is content-based. Titan first claims that its video productions are an expressive activity which is protected by the First Amendment because they are dramatizations which depict moral issues and are best classified as dramatic social satire. Plaintiffs further claim that this form of expression has been singled out for taxation solely on the basis of its content, i.e., professional wrestling. In support of its contentions, Titan relies on Arkansas Writers’ Project, Inc. v. Ragland, 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), in which the United States Supreme Court held that a state sales tax which exempted religious, professional, trade and sports periodicals only was unconstitutional under the First Amendment as discriminating on the basis of the content of the message delivered by the protected speech. Titan contends that because no other video programs, including those depicting drama, are subject to the media rights tax, the New Jersey tax is likewise discriminatory. Plaintiff further contends that this case is also governed by Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), in which the Supreme Court invalidated a tax on door-to-door solicitation because the court found it forced Jehovah’s Witnesses to pay a tax on the privilege of exercising their freedom of religion. Titan claims that the New Jersey tax is likewise a tax based on its exercise of free speech.
*270 The board does not agree that professional wrestling is a form of protected speech. Defendant claims that professional wrestling is pure entertainment and, thus, lacks the communicative elements necessary to be classified as speech. In support, defendant relies on Murdock v. City of Jacksonville, Florida, 361 F.Supp. 1083 (M.D.Fla.1973), in which the district court refused constitutional protection to professional wrestling matches of another promoter on the basis that wrestling did not qualify as a form of speech. Secondly, the board contends that even if professional wrestling is a form of expression, it should not be accorded First Amendment protection. The board distinguishes cases granting First Amendment protection to other forms of entertainment, e.g., Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) (motion pictures), and Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (rock musicals), on the basis that these forms of entertainment communicate significant political or social ideas to the public. Defendant also contends that even if professional wrestling were deemed protected speech, it would be classified as symbolic speech, and thus, subjecting the controversial statute to a less stringent standard of review. The board claims that under this level of review the statutory scheme, including the tax, would be a valid exercise of state police powers. The board also denies that the statute impermissibly discriminates on the basis of content and distinguishes Minneapolis Star v. Minnesota Comm, of Rev., 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), Arkansas Writers’ Project, supra, and Texas Monthly, Inc. v. Bullock, 489 U.S. 1,109 S.Ct. 890,103 L.Ed.2d 1 (1989), on the basis that those cases involved selective taxation of the press. Finally, with respect to the First Amendment, the board argues the tax is valid because it does not subject the activity to a prior restraint, but rather is “imposed as a regulatory measure to defray the costs of policing the activities in question.” Murdock v. Pennsylvania, supra, 319 U.S. at 114, 63 S.Ct. at 875.
The primary issue in deciding the First Amendment claim is whether the professional wrestling productions promot *271 ed by Titan are protected speech. See Texas v. Johnson, 491 U.S. 397, 402-403, 109 S.Ct. 2533, 2538, 105 L.Ed.2d 342, 352 (1989). Titan has submitted an affidavit which states that it purports to communicate social and moral ideas, and the board has not refuted this. It is not for the court to pass on the value of the communications. Expressive conduct will be afforded protection of the First Amendment where there is an intent to convey a particularized message and a great likelihood that the message will be understood by those who view it. Id. 404-405, 109 S.Ct. at 2539, 105 L.Ed.2d at 353. I, therefore, find that Titan’s wrestling productions constitute a form of First Amendment protected speech.
The next issue is whether the New Jersey media rights tax places an impermissible burden on Titan’s freedom of speech. It is well settled that “a discriminatory tax on the press burdens rights protected by the First Amendment.” Arkansas Writer’s Project, supra, 481 U.S. at 227, 107 S.Ct. at 1726. In Arkansas Writer’s Project, the United States Supreme Court applied strict scrutiny to invalidate a tax based on the content of certain magazines. In support of its decision the Court stated:
A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected. When the State imposes a generally applicable tax, there is little cause for concern. We need not fear that a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency. [Id. at 228, 107 S.Ct. at 1727, (quoting Minneapolis Star, supra, 460 U.S. at 585, .103 S.Ct. at 1371.)]
An extension of this logic leads to the conclusion that a discriminatory tax on speech also impermissibly burdens First Amendment rights.
However, while the productions in issue deserve First Amendment protection because of their classification as speech, they are decidedly not “pure speech” because their message is *272 not entirely written or spoken[3]. For the purpose of determining the validity of the media rights tax, these productions must be regarded as “symbolic speech” or expressive conduct.
The standard of review for a statute restricting expressive conduct depends on whether the law is “directed at the communicative nature of conduct.” Johnson, supra, 491 U.S. at 406, 109 S.Ct. at 2540, 105 L.Ed.2d at 355. Where government interest is unconnected to the expression regulated and “speech and nonspeech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.” Ibid, (quoting United States v. O’Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1983)). In the subject case the State is concerned with regulating the combative sports themselves, not the transmission of these sports. Since this interest is unrelated to the suppression of expression, the appropriate test for validity of the statute is the one set forth in O’Brien. See Johnson, supra, 491 U.S. at 407-408, 109 S.Ct. at 2541, 105 L.Ed.2d at 355.
In O’Brien, the Court upheld a statute proscribing the burning of draft cards and espoused a four-part test for validity of statutes regulating communications which combine both speech and nonspeech elements. Such regulation is justified if: 1) the regulation is within the constitutional power of the government; 2) it furthers an important or substantial governmental interest; 3) the governmental interest is unrelated to the suppression of free expression; and 4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. 391 U.S. at 377, 88 S.Ct. at 1677.
*273 In the exercise of police power, a state may enact a statute to promote public health, safety or the general welfare. State, Dep’t of Environ. Protect, v. Ventron, 94 N.J. 473, 499, 468 A.2d 150 (1983). The statute in issue is an exercise of that police power. Further, the State’s interest in the safety of combative sports participants is a substantial one, which is completely unrelated to the suppression of free expression. The enactment thus satisfies the first three prongs of the O’Brien test.
 As a purely revenue-raising measure, the media rights tax may be unconstitutionally violative of the First Amendment as a discriminatory restriction on speech. See Minneapolis Star, supra, 460 U.S. at 586, 103 S.Ct. at 1371, 75 L.Ed.2d at 305 (state interest in raising of revenue cannot justify special treatment of press). However, as a narrowly-tailored license fee, the media rights tax would pass the test for constitutional validity.
The determinative issue is whether the incidental restriction on alleged First Amendment freedoms is “not greater than essential” to the furtherance of the State’s interest in the safety of combative sports participants. The tax in issue purports to be a license fee. Yet, in the submissions of the parties, there is no certification of the activities performed by the board and the costs associated with these activities. In short, there is not enough information to determine whether the statute is sufficiently narrowly tailored.
There is case law discussing the relationship between license fees and First Amendment rights. See Murdock v. Pennsylvania, supra, and Follett v. McCormick, 321 U.S. 573, 64 S. Ct. 717, 88 L.Ed. 938 (1944). Murdock involved an ordinance imposing a flat license tax for the privilege of canvassing or soliciting within a municipality. Defendants were Jehovah’s Witnesses who were arrested for violating the ordinance by failing to pay the license tax. The Court held that, as applied to Jehovah’s Witnesses, who disseminated their religious beliefs through the sale of books, the ordinance was an unconstitution *274 al invasion of First Amendment rights. The Court criticized the statute for exacting a tax on the communication itself, 319 U.S. at 112, 63 S.Ct. at 874, and stated that “[a] state may not impose a charge for the enjoyment of a right granted by the federal constitution.” Id. at 113, 63 S.Ct. at 875.
In Follett, the court held invalid an occupation license fee as applied to a bookseller of religious material who engaged in the activity as a means of spreading his religious beliefs, even though this activity provided his sole source of income. Murdock and Follett, however, were followed by Breard v. Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951), which upheld an ordinance prohibiting door-to-door solicitation even though it prevented the door-to-door sale of subscriptions to magazines, an activity covered by the First Amendment. Thus, the constitutional prohibition against license fees on First Amendment activities is an exception applicable only to noncommercial activities. Further, the United States Supreme Court has only applied the exception to the religious belief context. See also Jones v. Opelika, 319 U.S. 103, 63 S. Ct. 890, 87 L.Ed. 1290 (1943). Other courts, however, have extended the protection against license fees to political speech. See Hull v. Petrillo, 439 F.2d 1184 (2 Cir.1971) (involving sale by Black Panthers of their newspaper); People v. Krebs, 54 Misc.2d 578, 282 N.Y.S.2d 996 (Crim.Ct.1967) (involving sale of political buttons expressing opposition to Vietnam War); and Satinoff v. Commonwealth, 128 Pa. Cmwlth. 93, 562 A.2d 996 (1989) (conviction for peddling political magazines without license reversed where record clearly indicated that primary purpose was to discuss political ideas and license fee was not a nominal fee). Nothing in taxpayer’s certification indicates that the primary purpose of Titan in performing its wrestling exhibitions was to make political or religious statements rather than to make profit. A tax on its activities which is regulatory in nature is not per se unconstitutional.
Summary judgment is appropriate where there is no genuine issue of material fact. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74, 110 A.2d 24 (1954). There remains an *275 issue of material fact, whether the incidental restriction on alleged First Amendment freedoms is “not greater than essential” to the furtherance of the state’s interest, and therefore summary judgment on the grounds of a First Amendment violation or validity is inappropriate.
III.

The Commerce Clause Claim.

Titan’s second argument is that the media rights tax violates the Commerce Clause because it is not fairly apportioned. Titan alleges that the statute is both internally and externally inconsistent because other states could tax the identical sale of media rights, and in fact have done so. Plaintiff also claims that the tax does not satisfy the four-pronged test set forth in Complete Auto Transit v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Finally, Titan argues that the statute violates the Foreign Commerce Clause because it creates the possibility of multiple international taxation, and infringes on the ability of the federal government to speak with one voice when regulating commercial relations with foreign governments.
The board denies that New Jersey lacks substantial nexus with the interstate communications and relies on Goldberg v. Sweet, 488 U.S. 252, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989), a case involving interstate telephone calls, for the proposition that the state of origination of the communication has the required nexus. Defendant also claims that the tax is both internally and externally consistent.
The tax in issue seeks to tax an interstate transmission. This is an activity in interstate commerce, and as such is governed by Complete Auto Transit and its four pronged test, which requires a tax on interstate commerce to: 1) be applied to an activity with a substantial nexus with the taxing state; 2) be fairly apportioned; 3) not discriminate against interstate com *276 merce; and 4) be fairly related to services provided by the state.
The first prong of the test is met. As the state of origination of the transmissions and location of the performance of the events, New Jersey clearly has a substantial nexus with the activity.
As regards fair apportionment, there are two tests, internal and external consistency. Internal consistency requires that a tax be structured so that if every state were to impose an identical tax, no multiple taxation would result. Applying that test, it is clear that there would be no multiple taxation because New Jersey only taxes transmissions on events which take place in New Jersey, and not events which take place in other states.
External consistency requires that a state only tax that portion of the revenues from the interstate activity which reasonably reflect the in-state component of the activity being taxed, and requires inquiry into actual taxation by other states. Several other states have imposed taxes relating to boxing and wrestling events. See Md.Ann.Code § 6-102(2); Va.Code Ann. § 54.1-815; Ky.Rev.Stat.Ann. § 229.031. Titan alleges that the Maryland tax is necessarily duplicative of the New Jersey tax because Titan has already been required to pay tax to Maryland on the broadcast rights for exhibitions shown in Maryland. However, the tax to which Titan refers was assessed under Md.Ann.Code art. 56 § 114A, which statute has since been repealed. The restated statute, Md.Ann.Code § 6-102(2), provides for a tax on any “charge, by ticket or per event or occasion basis, to view a telecast of a boxing or wrestling contest in the State regardless of the origin of the telecast.” This does not appear to be a tax on broadcast rights, but merely a tax on ticket and subscription sales, and there is no proof that Maryland has imposed a tax on broadcast rights for events taking place in other states and telecast in Maryland.
*277 The Virginia statute is a tax on “total gross receipts from the sale of tickets of admission to, and rights to broadcast by radio or television.” Va.Code Ann. § 54.1-814. The tax applies to “[ejvery person, club, corporation or association holding, showing or exhibiting a simultaneous telecast ... viewed within this Commonwealth, whether originating in this Commonwealth or another state.” Va.Code Ann. § 54.1-815. While this tax could conceivably be applied to broadcast rights sold to broadcasters in Virginia for events held in New Jersey, there is no proof that the statute has been applied that way. Kentucky has also enacted legislation to regulate and tax boxing and wrestling events, Ky.Rev.Stat.Ann. § 229.031, but it is not clear whether the tax is meant to apply to out-of-state events or whether it has ever been so applied.
There are only two states which would have the required nexus to tax the transmission of wrestling exhibitions: the state of origination and the state of termination. Goldberg, supra, 488 U.S. at 263, 109 S.Ct. at 590, 102 L.Ed.2d at 618. Although this limits the risk of multiple taxation, the media rights tax does not provide any kind of apportionment or credit for taxes paid to other states. The tax in issue also does not provide the safeguards of the tax in Goldberg, which required the transmission to be charged to an in-state service address in order to be taxable, and also provided a credit for taxes paid to other states upon proof of payment by the taxpayer, resulting in even less overlap between state taxation. Thus, there is a question of material fact, whether the media rights tax is fairly apportioned, as required by the second prong of the Complete Auto Transit test.
The tax passes the third prong, which requires that the tax not discriminate against interstate commerce, because it is applied at the same rates regardless of whether the transmission is viewed in New Jersey or some other state.
The fourth prong requires a fair relationship between the activities and the services provided by the state. This does not relate solely to boxing and wrestling services, but *278 rather encompasses all governmental services provided within the state. Goldberg, supra, 488 U.S. at 267, 109 S.Ct. at 592, 102 L.Ed.2d at 621. The media rights tax passes this test.
A consideration of the Foreign Commerce Clause requires examination of two additional criteria: 1) the enhanced risk of multiple taxation; and 2) the impairment of federal uniformity in an area where federal uniformity is essential. Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979). In Japan Line, the United States Supreme Court invalidated a California property tax imposed on large cargo shipping containers temporarily located within the state. The Court considered that the containers were owned by Japanese companies and had their home ports in Japan, where property tax was paid, and that the tax contravened a national policy of removing impediments to the use of containers as instruments of international traffic.
The subject case is easily distinguished from Japan Line. The New Jersey tax does not seek to tax a foreign-owned instrumentality of international commerce, but rather, the transmission of an event which takes place completely within the State of New Jersey by a corporation incorporated in the United States. Further, the international trade issues considered by the Court in Japan Line are not relevant here. The New Jersey media rights tax does not violate the Foreign Commerce Clause.
There is a question of whether the media rights tax is fairly apportioned. Summary judgment on Commerce Clause grounds is inappropriate.
IV.

Due Process.

Titan claims that the media rights tax statute deprives the promoter of its due process rights under the Fourteenth Amendment. Titan alleges that the statute is procedurally defective in that the Board can deny Titan’s license without *279 notice or an opportunity to be heard. Plaintiff also claims that the tax is imposed on remote activities and that the state has not given anything for which it can ask return.
N.J.S.A. 5:2A-17, which provides for temporary suspension of a license by the board, also requires that a hearing shall be held within 30 days of such suspension unless extended for good cause. This provision ensures that licensees who are deprived of their licenses will be given an opportunity to be heard as required by the Due Process Clause. I also note that the deprivation alleged herein was not unequivocal, but merely conditioned on the non-payment of overdue taxes. Due process does not forbid the requirement to pay taxes as a condition to litigating the amount due. Schneider v. East Orange, 196 N.J.Super. 587, 596, 483 A.2d 839 (App.Div.1984), aff’d o.b. 103 N.J. 115, 510 A.2d 1118 (1986), cert. den. 479 U.S. 824, 107 S.Ct. 97, 93 L.Ed.2d 48 (1986); NY Susquehanna and WRR v. Vermeulen, 44 NJ. 491, 501, 210 A.2d 214 (1965).
The nexus requirement imposed by the Due Process Clause on states taxing income generated in interstate commerce is that there must be a “minimal connection” between interstate activities and the taxing state. Mobil Oil Corp. v. Commissioner of Taxes, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980). This requirement is met if the corporation avails itself of the “substantial privilege of carrying on business” within the state. Ibid.; Wisconsin v. J.C. Penney, 311 U.S. 435, 444-445, 61 S.Ct 246, 249-50, 85 L.Ed. 267 (1940). On the facts of the subject case this requirement is clearly met as Titan has conducted substantial business activities in New Jersey.
I conclude that the tax in issue does not violate the Due Process Clause of the Fourteenth Amendment.
V.

Equal Protection.

In its equal protection claim Titan alleges that it has been singled out for taxation solely because of the content of its *280 videos, in violation of the Fourteenth Amendment. This claim is intertwined with the First Amendment claim, and because the tax scheme directly implicates freedom of speech, it must be analyzed on First Amendment grounds. Arkansas Writer’s Project, supra, 481 U.S. at 227, n. 3, 107 S.Ct. at 1726, n. 3. The decision on the First Amendment issue is also dispositive of the equal protection issue.
VI.

Request for Refund.

Titan asserts that the Athletic Control Board should be ordered to refund media rights taxes paid by Titan. I need not address this argument at this time.
VII.

Conclusion.

The cross-motions for summary judgment are denied. The case will proceed to trial on the issues left open by this opinion.

 The tax is imposed on gross receipts from ticket sales including the face value of complimentary tickets at rates of: 3% on the first $25,000; 4% of the next $50,000; 5% of the next $125,000; and 6% of amounts exceeding $200,000, with a total cap of $100,000.

 ExampIes of these regulations are those which require wrestlers to be between 18 and 45 years of age, and to submit to an annual cardiogram, and prohibit any wrestler from performing while disabled. Further safety standards regulate padding for the ring and require that costumes be approved. The board also requires pre-exhibition physical examinations, and that a first-aid crew and ambulance be present during any event.

 AIthough the videos contain verbal banter by the announcers, this commentary is incidental to the allegedly communicative activity which is a combination of athletic displays and verbal statements.