LASSER, P.J.T.C.
This case involves the constitutional validity of the New Jersey boxing and wrestling media rights tax. N.J.S.A. 5:2A-20. Plaintiff, Titan Sports, Inc. (“Titan”), contends that the tax as applied by the State Athletic Control Board (the “board”) violates the First Amendment as well as the Commerce Clause of the United States Constitution.
In an earlier decision on cross motions for summary judgment, I held that Titan’s professional wrestling productions constitute symbolic speech and are thus a form of First Amendment-protected speech. I also held that, pursuant to the Commerce Clause test of fair apportionment, the media rights tax is internally consistent because it is structured so that if every state were to impose an identical tax (a tax on the sale or lease of rights to exhibit elsewhere an event that took place in the taxing state), no multiple taxation would result. Since these holdings did not dispose of all issues, and disputed material facts existed as to the remaining issues, the motions were *217 denied and a trial was scheduled. Titan Sports v. Athletic Control Board, 11 N.J.Tax 259 (Tax Ct.1990).
Two issues of material fact remained with regard to the First Amendment and the Commerce Clause. First, evidence was required concerning the nature and extent of the board’s activities devoted to protecting the health and safety of professional wrestlers. Second, proof was required concerning alleged duplicative taxation by other states of gross receipts received from the sale of media rights. A trial was held and evidence was presented on these two factual issues.
I must determine on the facts presented at trial: (1) whether the media rights tax is a restriction on Titan’s First Amendment right of free speech and, if it is, whether the restriction is no greater than essential to the furtherance of the State’s interest, and (2) whether, under the Commerce Clause, the media rights tax is externally consistent.[1]
I.

The New Jersey Media Rights Tax.

The New Jersey media rights tax is described in detail in my previous opinion. Titan, supra at 265-66. By way of review, this tax constitutes part of the legislation governing boxing, wrestling, kick boxing and combative sports. N.J.S.A. 5:2A-1 et seq. The Boxing, Wrestling and Combative Sports Act (“the act”) states that it was enacted to protect the safety and well-being of participants in boxing, wrestling, kick-boxing and combative sports exhibitions, events, performances and contests occurring in the State of New Jersey. N.J.S.A. 5:2A-2.
To further these goals, the Athletic Control Board was created to manage, supervise and collect license fees and taxes *218 from promoters of public boxing, wrestling, kick boxing and combative sports events. N.J.S.A. 5:2A-4.
The board collects and administers two taxes under the statute: a tax on ticket sales and, the tax presently at issue, a “media rights” tax. The media rights tax is imposed pursuant to N.J.S.A. 5:2A-20c, as follows:
Every promoter who holds any boxing, wrestling, kick boxing or combative sports exhibition, event, performance or contest shall, within seven days ... after the conclusion thereof, pay to the board a tax:
(2) On any moneys received by reason of the lease or sale of television, including cable television and closed circuit television, moving picture or radio rights in connection with any such exhibition or performance a tax of 5% of the first $50,000.00 derived from the lease or sale of television, moving picture or radio rights; 3% of the next $100,000.00 derived from the lease or sale of those rights; 2% of the next $100,000.00 derived from the lease or sale of those rights; and 1% of any amount in excess of $250,000.00 derived from the lease or sale of those rights, except that in no event shall any tax assessed under the provisions of this subsection exceed $100,000.00 for each exhibition, event, performance or contest.
For the purposes of this subsection, the total gross receipts from the sale of tickets or from the lease or sale of television, moving picture or radio rights shall not be subject to any reduction or allowance of any kind whatsoever.
The two taxes, as well as licensing fees collected by the board, are deposited into a “nonlapsing dedicated” state Athletic Control Board account (the “account”). N.J.S.A. 5:2A-19. The funds in this account are used in conjunction with an annual state appropriation for the “necessary expenses” of the board. Ibid. Pursuant to testimony offered on behalf of the board, necessary expenses include the salaries of full-time and part-time board officials and employees, office and equipment rental, office supplies and travel expenses. Funds from the account were used to pay for furnishing the new board office. The chief administrative officer of the board testified that, as a result of New Jersey’s budgetary problems, he anticipated the account would also be relied on during fiscal year 1992-1993 to pay for expenses not covered by the projected annual appropriation.
The act provides that “[t]o the extent that moneys are available beyond those funds necessary to meet the costs of *219 [the board], the board shall determine at the close of each fiscal year an appropriate amount to be returned to the General Fund for general State purposes.” N.J.S.A. 5:2A-19c. The chief administrative officer testified that the annual state appropriation is intended to provide financial stability for the board while the media rights tax and other monies collected and deposited in the account are intended to supplement the annual appropriation.
Titan contends that the taxes and fees deposited by the board in the account have not been used to supplement the annual appropriation to fund the board’s activities but have simply been paid to the state general fund by the board, thus rendering the media rights tax unnecessary. This argument misconstrues the mechanics of the board’s funding. The annual appropriation was initiated to ensure a stable budget for the board until the taxes and fees collected under the act provided a reliable income for the board. Payments from the account to the state general fund to date represent partial reimbursements for prior annual appropriations. Thus, Titan’s argument regarding the use of the account is without merit. The Legislature has chosen to fund the costs of the board in part by the media rights tax. It is within the power of the Legislature to fund the board in part by general appropriation and in part by the media rights tax.

The State Athletic Control Board.

The board has implemented its mandate to manage, control and supervise professional boxing, wrestling and other combative sports events by adopting extensive enabling regulations. N.J.A.C. 18:46-1.1 et seq. Of specific import to the subject case are the “Rules Governing Wrestling Exhibitions” (the “rules”), which were designed to protect the health and safety of participants in professional wrestling matches. N.J.A.C. 13:46-20 et seq. The rules prescribe the practice and procedure for licensing and insuring professional wrestling athletes, promoters and *220 sporting event personnel such as ringside physicians, referees and announcers.[2]
The Athletic Control Board maintains a staff of 12 full-time employees, including two deputy commissioners and an administrative information technician. The commissioners and part-time inspectors monitor safety procedures both at ringside and in the locker rooms during combative sporting events. They also monitor the collection of the ticket tax and provide assistance to promoters in tabulating ticket sales during exhibitions, if necessary.
The board’s information technician testified that, prior to each sporting event, she collects information about the identity and health of professional wrestlers and exhibition participants. When necessary, she follows up on missing or inaccurate information and medical records provided by wrestlers or promoters. The technician then collates this data and furnishes it to promoters, board physicians and inspectors in the form of a “preshow package.” After each event, she collates additional data or licenses collected during the match, documents any injuries and facilitates the filing of medical and insurance claims by wrestlers.
In addition to its other supervisory duties, the board oversees the discipline of professional wrestlers. Disciplinary procedures can entail informal hearings with the commissioner and/or formal hearings before the board. The board’s chief administrative officer testified that the board has been required to suspend wrestlers pursuant to such disciplinary proceedings.
At trial, the chief administrative officer also testified that, based on his seven years of experience with the board, approximately 25% of the board’s total expenses were devoted to the *221 regulation of professional wrestling.[3] He stated that his estimate was based on several informal studies the board had conducted of its regulatory activities. This witness further testified to wrestling receipts from Titan Sports and other combative sports promoters, as follows:
Total Combative Sports Revenue (Taxes & Fees) Total Wrestling Receipts (Taxes & Fees) Wrestling Receipts From Titan (Taxes & Fees)
1987 $349,452 $ 50,929 $ 11,069
1988 811,330 143,643 91,374
1989 871,992 313,138 164,969
1990 837,299 161,457 109,611
He indicated that although wrestling receipts may vary from year to year, over time the board spends more to supervise and regulate professional wrestling than it receives from this combative sport.

Titan Sports, Inc.

In my prior opinion, I outlined the extensive promotional and marketing activities of Titan Sports. Titan, supra at 266-68. The following discussion summarizes the facts pertinent to Titan’s claims regarding the media rights tax.
Titan produced Wrestlemania IV in Atlantic City, New Jersey, on March 27, 1988. Titan entered into license agreements with cable television operators to broadcast this event throughout the United States and abroad. In 1989, Titan paid a media *222 rights tax of $61,639 for this event under protest. Titan was the only New Jersey-licensed wrestling promoter who sold media rights to a New Jersey event and was therefore the only wrestling promoter in New Jersey to pay the media rights tax in 1989.
Among the Wrestlemania IV license agreements were agreements with eight Maryland cable television operators. Pursuant to a written demand from the Maryland Athletic Commission, Titan paid the 10% Maryland television tax of $7,906 on gross receipts of $79,064 from these operators. See Md.Ann. Code art. 56, §§ 114; 114(A) (1987).
Titan Sports produced Wrestlemania V in Atlantic City, New Jersey, on April 2, 1989. Titan entered into license agreements with cable television operators throughout the United States and abroad to broadcast this event. In 1990, Titan paid a media rights tax of $90,396 for this wrestling exhibition under protest. Again, Titan was the only wrestling promoter who sold media rights to a New Jersey event and therefore was the only wrestling promoter required to pay this tax.
Titan entered into license agreements with 11 Maryland cable television operators and 13 Kentucky cable television operators for the distribution of Wrestlemania V. Titan paid the 10% Maryland television tax in the amount of $16,500 for gross receipts paid by Maryland operators for the broadcast rights to this wrestling event. Titan states that it also paid a Kentucky television tax of $1,880 pursuant to the 5% Kentucky gross receipts tax on the sale of distribution rights for Wrestlemania V to Kentucky cable television operators. See Ky.Rev.Stat. Ann. § 229.031.
II.

The First Amendment Claim.

A.

Introduction.

In my prior opinion, I found that the State’s interest in the subject case is the regulation of professional wrestling events. *223 Titan, supra at 273. I also found that Titan’s wrestling productions consist of communication combining both speech and nonspeech elements. Id. at 270-72. Pursuant to the Supreme Court’s decision in United States v. O’Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), I noted that where governmental regulations are not directed to speech but “speech and nonspeech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.” Id. at 272 (citing O’Brien, 391 U.S. at 376, 88 S.Ct. at 1678, 20 L.Ed.2d 672).[4]
O’Brien enunciated a four-part test for reviewing statutes restricting communication which combines both speech and nonspeech elements. Governmental regulation is justified if: (1) it is within the constitutional power of the government; (2) it furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than essential to the furtherance of that interest. 391 U.S. at 377, 88 S.Ct. at 1679, 20 L.Ed.2d at 680.
*224 The determinative issue remaining in the subject case is whether the media rights tax is a restriction on Titan’s First Amendment rights and, if it is a restriction, whether the restriction is “no greater than essential” to further New Jersey’s substantial interest in protecting the health and safety of professional wrestlers and show participants. As a collateral issue, I must examine whether New Jersey’s interest in regulating professional wrestling is unrelated to the suppression of free expression. Based on the additional evidence presented at trial, I am now able to determine whether the New Jersey media rights tax conforms to the requirements of the O’Brien test.
B.

Relation of Media Rights Tax to Free Expression.

Titan argues that because it was the only promoter of professional wrestling events who paid the tax in New Jersey in 1989 and 1990, the media rights tax is aimed at one speaker: Titan Sports. Consequently, Titan contends that, since 1989, the subject tax has discouraged Titan from conducting live professional wrestling events in New Jersey intended for public broadcast.
The danger inherent in the taxation of a small number of speakers is two-fold. First, selective taxation threatens to censor the ideas or views of a particular group in contravention of the guarantee of free speech. Second, a taxing statute which targets specific speakers forces them to “pay” disproportionately for their views. See, e.g., Leathers v. Medlock, supra; Minneapolis Star v. Minn. Comm. of Rev., 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983); Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936).
Pursuant to my prior opinion and the Supreme Court’s decision in Leathers, supra, I do not agree that Titan has been targeted for discriminatory taxation. In Leathers, the Court stated that “differential taxation of speakers ... does not implicate the First Amendment unless the tax is directed at, or *225 presents the danger of suppressing, particular ideas.” 499 U.S. at-, 111 S.Ct. at 1447, 113 L.Ed.2d at 507-08 (citations omitted). A constitutional question is not implicated, however, by a content-neutral taxing statute. The wording of the media rights tax and the other provisions of the Boxing, Wrestling and Combative Sports Act is content-neutral and in no way seeks to suppress particular ideas.
In Leathers, the Court noted that “[¡Inherent in the power to tax is the power to discriminate in taxation.” 499 U.S. at-, 111 S.Ct. at 1446, 113 L.Ed.2d at 506. Legislatures are thus provided “broad latitude in creating classifications and distinctions in tax statutes.” Ibid. The New Jersey Legislature has determined that, like producers of boxing and kick-boxing exhibitions, promoters of professional wrestling events must pay the media rights tax. Since Titan is only one of many combative sports promoters who pay this tax, it has not been singled out for selective taxation. The fact that Titan has not been singled out also resolves any equal protection considerations which may have been raised by the subject litigation. See Titan, supra at 279-80.
Titan has also argued that its liability under the media rights tax is unduly burdensome in amount. The Supreme Court considered a similar argument in Minneapolis Star v. Minn. Comm. of Rev., supra. In that case, the Minneapolis Star & Tribune Co. claimed that because it was forced to pay approximately 66% of the total revenue raised by a use tax, the tax was disproportionately aimed at a small number of taxpayers. 460 U.S. at 578-79, 103 S.Ct. at 1368, 75 L.Ed.2d at 300. The Minnesota use tax was imposed on the cost of ink and paper used to produce publications, exempting the first $100,000 of cost. The Court agreed that the financial inequity created by the taxing statute was a significant factor in the Court’s decision to strike down the tax because it “resemble[d] a penalty for a few of the largest newspapers” rather than a *226 balanced taxing statute. Id. at 592, 103 S.Ct. at 1375, 75 L.Ed.2d at 309.
In the subject case, Titan did not pay a disproportionate amount of the total revenues collected by the board. Based on the figures testified to by the board’s chief administrative officer, it appears that Titan, as one promoter of combative sports among many, contributed an average of 16% of the total combative sports receipts collected by the board during the two years in issue. Thus, Titan may not complain that it has been selected to pay more than its “fair share” of the cost of regulating boxing and wrestling in New Jersey. Further, I find that the media rights tax does not restrict Titan’s First Amendment rights nor does the tax censor the speech elements of the events promoted by Titan.
C.

Relation of Media Rights Tax To Cost of Regulating Professional Wrestling.

Titan claims that the media rights tax stifles its First Amendment right of free speech because the taxing statute imposes a “sweeping” assessment on promoters of professional wrestling events. Titan asserts that instead of imposing narrowly tailored fees related to the specific costs of regulating the nonspeech element of Titan’s wrestling productions, the subject tax is assessed principally as a revenue-raising device by the State upon both the speech and nonspeech aspects of Titan’s activities.
The Athletic Control Board conceded in its post-trial brief that Titan’s operations constitute “a form” of First Amendment-protected speech. Relying on O’Brien, supra, and Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), the board contends, however, that because professional wrestling is not “pure” speech, the State is afforded greater latitude in regulating conduct in which speech and nonspeech elements are commingled. The board asserts that its activities are directed to ensuring the health and safety of participants and spectators of professional wrestling events. It claims that the language and content of the act and accompanying rules *227 are limited to regulating the substantial nonspeech elements of professional wrestling.
Further, the board contends that the media rights tax is appropriately related to the cost of regulating professional wrestling. It asserts that the chief administrative officer’s estimate that 25% of total board expenditures are made for wrestling expenses is reasonable in light of the nature and extent of its supervisory activities and the absence of proof to the contrary.
The board has presented testimonial and documentary proof of its activities and expenditures to promote the health and safety of professional wrestling. The board pays the salaries of one deputy commissioner and an information technician, who devote all of their time to professional wrestling, as well as a percentage of the salaries of board inspectors who supervise the operation of specific wrestling events. Other board members and commissioners also devote time to disciplining professional wrestlers, and a portion of their salary expense is related to regulating professional wrestling. Information concerning the mental and physical health of professional wrestlers must be collated, updated and maintained on a continuous basis, and a portion of the board’s administrative overhead is properly chargeable to the regulation of professional wrestling.
I find from the evidence presented and the testimony of the chief administrative officer that approximately 25% of the board’s total expenditures are devoted to the supervision of professional wrestling and that, over time, the taxes imposed on wrestling are less than the cost of regulating wrestling. I also find that the tax furthers an important or substantial governmental interest—regulation of the potentially hazardous wrestling matches and exhibitions. Thus, even if the media rights tax did restrict Titan’s First Amendment rights, imposition of this tax is a measure no greater than essential to further New Jersey’s substantial interest in protecting the health and safety of professional wrestling athletes, exhibition participants and spectators.
*228 III.

The Commerce Clause Claim.

Titan contends that the New Jersey media rights tax is violative of the Commerce Clause of the United States Constitution and argues that Maryland and Kentucky taxes are imposed on the same transactions taxed by New Jersey, thereby creating an impermissible burden on interstate commerce.
The Supreme Court has ruled that to ensure that each state taxes only its “fair share” of interstate transactions, a state tax must be, inter alia, “fairly apportioned.” Goldberg v. Sweet, 488 U.S. 252, 257-58, 109 S.Ct. 582, 587, 102 L.Ed.2d 607, 614 (1989) (citing the four-part Commerce Clause test outlined in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977)). A tax is fairly apportioned if it is both “internally” and “externally” consistent. 488 U.S. at 261-62, 109 S.Ct. at 589, 102 L.Ed.2d at 607. The issue here is whether the media rights tax is externally consistent so as to withstand challenge under the Commerce Clause.
Titan claims that the media rights tax is not externally consistent because its imposition has resulted in actual multiple taxation of Titan’s gross receipts from the lease or sale of media rights for Wrestlemania IV and V to cable television operators for distribution in Maryland and Kentucky. Since the statute offers no relief from this cumulative burden on interstate commerce (such as a credit for taxes paid to other jurisdictions), Titan contends that the media rights tax is unapportioned and violative of the Commerce Clause.
The board does not agree that Titan has an obligation to pay Maryland and Kentucky television taxes on events originating in New Jersey. It urges this court to examine the Maryland and Kentucky taxing statutes to determine whether these states tax Titan on the licensing of media rights of events occurring in New Jersey to local cable television operators. The board argues that, as a result of Titan’s misinterpretation of foreign taxing statutes, Titan incorrectly paid tax to Mary *229 land and Kentucky on receipts appropriately taxed by New Jersey.
The board also asserts that since New Jersey is the only state which may tax Titan’s receipts from the license of broadcast rights to live events produced in this State, there is no need for a credit provision in the taxing statute. Thus, the board argues that the media rights tax is externally, as well as internally, consistent.
The Supreme Court enunciated the method for analyzing whether state taxing statutes are externally consistent in Goldberg v. Sweet, 488 U.S. 252, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989). Goldberg involved a challenge to a 5% Illinois excise tax imposed on the gross charge for interstate telecommunications that (1) originated or terminated in Illinois and (2) were charged to an Illinois service address. 488 U.S. at 256, 109 S.Ct. at 586, 102 L.Ed.2d at 613. In upholding the statute, the Court found that state taxes assessed on gross charges of interstate transactions which are reasonably limited to the instate activity that triggers the taxable event are externally consistent.[5] 488 U.S. at 262, 109 S.Ct. at 589, 102 L.Ed.2d at 617. Therefore, this court must review the scope of New Jersey’s taxing statute as well as the scope of the Maryland and Kentucky television taxes.

Distribution of Wrestlemania IV and V.

Simultaneously with each event, Titan transmitted Wrestle-mania IV and V via satellite to cable television operators outside New Jersey. These cable operators then distributed *230 these events as follows. Upon receipt of Titan’s signal, the cable television operators cablecast Wrestlemania IV and V through their own closed-loop cable transmission lines to pay-per-view subscribers. Additionally, these out-of-state cable television operators distributed packaged video programs of the exhibitions for subsequent viewing.[6]
Pursuant to Titan’s license agreements with cable television operators,[7] the operators paid Titan, as a license fee, a percentage of the monies paid by their viewers for simulcast or subsequent broadcasts of Wrestlemania IV and V.[8]

The Maryland Television Tax.

During the years at issue in the subject case, Maryland imposed a 10% license fee on gross receipts from the sale of broadcast rights to boxing, sparring or wrestling matches as well as a 10% tax on ticket sales or other fees paid for viewing such matches. See Md.Ann. Code art. 56, §§ 114; 114(A).[9] In pertinent part, § 114A of the Annotated Code of Maryland states:
Every person, club, corporation or association which may hold [a combative sporting event] shall, within 72 hours after the determination of every contest, *231 furnish to the Commission a written report ... showing the exact number of tickets sold for such contest, and the amount of gross proceeds thereof ... and shall also within the said time pay to the said Commission a license fee of ten per centum (10%) of its total gross receipts from the sale of tickets of admission and the sale of radio, television or motion picture rights to such boxing or sparring or wrestling match, contest or exhibition____
Section 114A of the Annotated Code of Maryland provides in pertinent part:
Every person, club, corporation or association holding, transmitting, or showing any boxing, sparring or wrestling matches on a closed circuit telecast or subscription television viewed within this State, whether originating within this State or another state and for which tickets are sold, or if no tickets are sold for which an additional fee is charged to a viewer on a per event or per occasion basis shall furnish to the Commission a written report ... stating the exact number of tickets sold or number of persons paying the additional fee for such showing or viewing and the amount of gross proceeds thereof ... and shall, within 72 hours after the showing ... pay to the said Commission a tax of 10 percent of its total gross receipts from the sale of tickets for the showing or 10 percent of its total gross receipts from the additional fees charged for the viewing of said boxing, sparring or wrestling match. However, the tax does not apply to any match shown or transmitted for which neither tickets are sold nor an additional fee on a per event or per occasion basis is charged.
The Maryland assistant attorney general who serves as counsel to the Maryland State Athletic Commission testified at trial that, in a letter to Titan Sports dated April 22, 1991, he explained that Maryland’s television tax is imposed on local cable companies. He concluded in the letter and at trial that although Titan had remitted the tax, in fact it was “not the responsibility of the producer of [an] event such as [Titan Sports]” to pay the tax.

The Kentucky Television Tax.

The Kentucky revised statutes governing public safety and morals impose, in relevant part, a tax on tickets sold and receipts from the sale of broadcast rights to professional boxing or wrestling events. Kentucky’s Rev.Stat.Ann. § 229.031 provides:
(1) Every person conducting a professional boxing or wrestling match or exhibition ... shall, within twenty-four (24) hours after the termination of every match or exhibition, furnish to the commission a written report ... showing the number of tickets sold for the match or exhibition, the amount of the gross receipts from such sale and such other matters as the commission prescribes. *232 He shall also, within the same period, pay to the commission a tax of five percent (5%) of the gross receipts from the sale of all tickets to the match or exhibition.
(2) He shall also pay to the commission, as soon as possible, a tax of five percent (5%) of the gross receipts from all other sources, direct or indirect, including ... the gross receipts from the sale, lease or other exploitation of broadcasting, television and motion picture rights of such contests____
(3) All taxes required to be paid by this section shall be computed on the gross receipts without any deduction whatsoever for commissions, brokerage, distribution fees, advertising or other expenses, charges or recoupments ... exclusive of any federal excise taxes.
The Kentucky television tax is imposed on the “gross receipts” that promoters licensed to conduct live wrestling matches in Kentucky receive from the sale of tickets to such events and on the “gross receipts” these promoters earn from the sale or lease of broadcast rights to events they produce in that state. Ky.Rev.Stat.Ann. § 229.031.

External Consistency.

The New Jersey media rights tax is imposed on “any moneys” Titan receives from the sale or lease of broadcast rights for professional wrestling events produced in New Jersey. N.J.S.A. 5:2A-20c. The New Jersey media rights tax thus is imposed on the producer of the event in New Jersey, not on out-of-state exhibitors.
The Maryland tax is imposed on ticket sales and broadcasts of professional wrestling exhibitions originating in Maryland. As an in-state wrestling promoter, Titan would be responsible for payment of the Maryland ticket tax.[10] Since Titan was not a cable operator in Maryland, it appears, however, that Titan should not have been called upon to pay the Maryland television tax on gross proceeds from the license to broadcast New Jersey events in Maryland. The testimony offered at trial by the Maryland assistant attorney general responsible for *233 counseling Maryland’s Athletic Commission confirms my finding that only Maryland cable operators who charged their own customers to view Wrestlemania IV and V were responsible for paying the Maryland television tax.
A Maryland tax on the exhibition in Maryland of an event occurring in New Jersey, whether by tax on ticket sales or tax on receipts from viewers, is a tax on a transaction separate and distinct from the New Jersey media rights tax on the license by Titan of the right to exhibit the event in a foreign state. Both the New Jersey and the Maryland taxes may be measured by the gross receipts from viewers, but the New Jersey tax is only imposed on Titan’s share of the gross receipts. Each state is taxing a separate transaction, with New Jersey taxing the sale to the cable operator and Maryland taxing the sale by the cable operator to its viewers. This court has previously found that, absent evidence of actual multiple taxation, different states may tax different phases of an integrated transaction without impermissibly burdening interstate commerce. Airwork Service Div. v. Taxation Div. Director, 2 N.J.Tax 329 (Tax.Ct.1981), aff’d 4 N.J.Tax 532 (App.Div.1982), aff’d 97 N.J. 290, 478 A.2d 729 (1984), cert. den. 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).
With respect to the Kentucky tax, at trial, the board introduced two letters into evidence regarding the interpretation of the Kentucky television tax. The first letter, dated March 7, 1988, from the Kentucky assistant attorney general who serves as counsel to the Kentucky Athletic Commission, stated that professional wrestling or boxing matches “conducted or promoted in Kentucky,” emphasis supplied, are subject to the provisions of Kentucky Revised Statute § 229.031. The second letter, dated May 12, 1988, was sent by the Kentucky Athletic Commission to all promoters licensed in Kentucky and discussed the applicability of § 229.031 to events produced by these promoters. These letters indicate that the Kentucky tax is payable by Kentucky-licensed promoters on events conducted in Kentucky. Subsection (1) of the statute relates to ticket sale *234 reports and the ticket sale tax, which indicates that this section applies to events conducted in Kentucky. The language of subsection (2) refers to the persons described in subsection (1) who I conclude are those who conduct professional wrestling matches in Kentucky. Ky.Rev.Stat.Ann. § 229.031. The words “he shall also pay” and “such contests” in subsection (2) refer back to the phrase “person conducting a professional boxing or wrestling match” found in the first subsection, and therefore limit the Kentucky tax to gross receipts from sales of the right to broadcast events originating in Kentucky. Ibid.
In conjunction with the documentary evidence presented at trial, the language of the taxing statute demonstrates that Kentucky does not contemplate taxing the license of broadcast rights of New Jersey wrestling events such as Wrestlemania V to Kentucky cable operators, but imposes tax on the sale or lease of broadcast rights to Kentucky events.
Titan’s chief financial officer testified at trial that Titan was a licensed wrestling promoter in Kentucky during the years at issue. As a licensed promoter, Titan conducted local live events in Kentucky on a frequent basis during 1988, 1989 and 1990 for which broadcast rights were licensed to cable television operators. The $1,880 television tax paid to Kentucky may have been paid by Titan as a Kentucky promoter on events originating in Kentucky. If it was paid for the sale to Kentucky cable operators of the right to broadcast Wrestlemania V, produced in New Jersey, it was apparently paid in error.
Titan’s argument that the New Jersey media rights tax is not fairly apportioned is based on its contention that its licensing agreements are also taxed by Maryland and Kentucky. The Maryland and Kentucky taxes are imposed on cable operators’ receipts from viewers of Wrestlemania IV and V in those states, not on Titan’s license of broadcast rights to these New Jersey events. Since New Jersey is the only state which actually taxes the subject transactions, Titan’s claim that the media rights tax is not externally consistent and therefore not fairly apportioned within the meaning of the Commerce Clause *235 must fail, and the statute is not constitutionally defective because it lacks a credit provision.
IV.
I conclude that the New Jersey media rights tax does not violate the First Amendment of the United States Constitution because the media rights tax is not a restriction on Titan’s First Amendment rights and the imposition of this tax is no greater than essential to further New Jersey’s substantial interest in regulating professional wrestling. The media rights tax does not violate the Commerce Clause because it is internally and externally consistent and therefore does not unconstitutionally burden interstate commerce. The Clerk of the Tax Court is directed to enter judgment in favor of the Director and dismissing the complaint.

“External consistency requires that a state only tax that portion of the revenues from the interstate activity which reasonably reflect the in-state component of the activity being taxed, and requires inquiry into actual taxation by other states." Titan, supra at 276. See Goldberg v. Sweet, 488 U.S. 252, 260-62, 109 S.Ct. 582, 588-89, 102 L.Ed.2d 607 (1988).

The board’s information technician testified that at the time of trial, the board was supervising the examination and insurance of 250 professional wrestlers, 29 referees, 28 timekeepers and 19 wrestling promoters.

Total expenditures of the board for the years 1989 and 1990 averaged $1,048,000. For these years, Titan’s payments for taxes and fees averaged approximately $137,300. Although Titan’s share of the taxes and fees paid by wrestling promoters was substantial because of Titan’s substantial wrestling promotions, its contribution to total board revenues from taxes and fees paid during 1989 and 1990 averaged only 16%, and of total board expenditures averaged 13%.

The State has questioned whether O'Brien remains valid precedent in light of Leathers v. Medlock, 499 U.S.-, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991). In Leathers, the Court upheld a generally-applied sales tax imposed by Arkansas on selected segments of print and televised media. The Court found that differential taxation of different types of media does not violate the First Amendment unless it discriminates on the basis of ideas.
O’Brien addressed the validity of statutes regulating expressive conduct combining both speech and nonspeech elements, whereas Leathers addressed legislation impacting “pure” speech. 499 U.S. at-, 111 S.Ct. at 1442, 113 L.Ed.2d at 502. However, in Leathers, the Court required a “compelling” justification for permitting incidental taxation of the press, 499 U.S. at-, 111 S.Ct. at 1443, 113 L.Ed.2d at 503, and in O'Brien the Court required a substantial or "important governmental interest in regulating the nonspeech element [of communication to] justify incidental limitations on First Amendment Freedoms." 391 U.S. at 376-77, 88 S.Ct. at 1678-79, 20 L.Ed.2d at 679-80. Thus, the decision in Leathers v. Medlock is not inconsistent with the conclusion in O’Brien that a significant governmental interest unrelated to the suppression of free expression justifies incidental restrictions on First Amendment rights.

The Court recognized that under circumstances in which a taxpayer’s service address and billing location are in different states, "some interstate telephone calls could be subject to multiple taxation.” 488 U.S. at 263-64, 109 S.Ct. at 590, 102 L.Ed.2d at 618. However, consistent with prior decisions, the Court also found that limited duplicative taxation does not impermissibly discriminate against interstate commerce. Ibid. (citing Container Corp. of America v. Franchise Tax Bd., 463 U.S. 159, 171, 103 S.Ct. 2933, 2943, 77 L.Ed.2d 545, 557 (1983); Moorman Mfg. Co. v. Bair, 437 U.S. 267, 272-73, 98 S.Ct. 2340, 2344, 57 L.Ed.2d 197, 204 (1978)).

Titan also exhibited Wrestlemania IV and V by closed circuit television to audiences in theaters in New Jersey and other states. Since Titan itself directly transmitted the closed circuit television events, it did not license the right to broadcast Wrestlemania IV and V to others. The media rights tax is not in issue as to these simultaneous broadcasts in theaters.

The media rights tax applies to the "lease or sale" of broadcast rights to boxing and wrestling matches or exhibitions. Licensing agreements providing for the right to use wrestling exhibitions for television broadcast are included within the scope of "lease or sale" of television rights, and no argument to the contrary has been made by Titan.

A Titan license agreement form for out-of-state cable operators in evidence provided that the cable operator was required to pay all state and local taxes for the use of the video program within the cable operator’s territory.

The Maryland tax actually consisted of three taxes: a broadcast tax, a ticket tax and a tax on pay-per-view television. The broadcast tax was repealed effective July 1, 1989.

At trial, the Maryland assistant attorney general testified that Titan conducted live events in Maryland during 1988. No evidence was presented by either party as to whether Titan licensed broadcast rights to these exhibitions or paid taxes to Maryland for such license.